**TUDOR INSURANCE COMPANY**

v.

**TOWNSHIP OF STOWE, a Duly Organized First–Class Township in Allegheny County, Harry J. Musko, John Jencik, James A. Mollica, Rocco D. Rizzo,: Frances Parrilla, Loy H. Kile, Robert Rippole, Martin A. Jacobs,: James B. Seleyo, Julienne Pawlowski, Paul Sweich, and John Zagari.**

**Appeal of STOWE TOWNSHIP, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 9, 1996.

Filed July 16, 1997.

Bonnie Brimmeier, Pittsburgh, for appellant.

Pamela G. Cochenour, Pittsburgh, for Tudor Ins. Co., appellee.

Before POPOVICH, FORD ELLIOTT and HESTER, JJ.

FORD ELLIOTT, Judge.

Appellant Stowe Township ("Stowe") claims trial court error in refusing to enter judgment notwithstanding the verdict or to order a new trial following a jury's determination that Stowe acted in bad faith when it falsely answered questions on an insurance application. Finding that the trial court erred in its charge to the jury on Tudor's burden of proof, we are constrained to remand for a new trial.

We are aware of our deferential standard when reviewing a trial court's decision to grant or deny a new trial: the power to grant or deny a new trial lies inherently with the trial court, and we will not reverse its decision absent a clear abuse of discretion or error of law which controlled the outcome of the case. *Ferguson v. Panzarella,* 445 Pa.Super. 23, 26–27, 664 A.2d 989, 991 (1995), *allocatur granted,* 544 Pa. 609, 674 A.2d 1072 (1996). We thus begin our review with that standard before us.

Appellee Tudor Insurance Company ("Tudor") brought a declaratory judgment action to determine whether a policy of insurance it had issued to Stowe was void as a result of misrepresentations and omissions on the application for insurance. The Public Officials Liability Insurance Policy issued by Tudor required Tudor both to defend and indemnify Stowe on a "claims-made" basis[1] for any alleged wrongful act committed by Stowe, its elected or appointed officials, or its employees (R.R. at 134a). The policy request was for $1 million in coverage, to become effective January 18, 1992. The application had been signed on November 11, 1991 by the Township secretary, Marie Incorvati, who attested that the information provided was true and correct to the best of her knowledge. Tudor claimed the policy was void because Ms. Incorvati had answered "none" to the following questions:

16. During the past five years, there has been no incident, claim, litigation, or threat of litigation (including Federal,

State or Local actions against the Public Entity and/or its officials) which would have fallen within the scope of this insurance had it been in effect except as follows: (if answer is none, so state)

17. No fact, circumstance or situation indicating the probability of a claim or action against which indemnification is or would be afforded by the proposed insurance is now known to any official or member of this entity except as follows: (if answer is none, so state)[.]

R.R. at 29a.

In March of 1994, a jury trial was held. Tudor introduced into evidence tape recordings of Township meetings and testimony of witnesses indicating that almost every Township meeting between January 10, 1991 and November 11, 1991, involved heated discussion among outraged citizens and Township commissioners over alleged misuse or misappropriation of $1.9 million in bond revenues. (R.R. at 123.) In addition, Stowe admitted that in late 1990, two of the commissioners were indicted on federal "RICO"[2] charges. (R.R. at 117–118.) These indictments were indicated on the application for insurance in answer to question 15(g). (R.R. at 29a, 31a.) Township citizens were further outraged by evidence that came to the public's attention during the federal RICO trial. (*Id.* at 136–37.) Newspaper articles announcing meetings to discuss proposed legal action appeared in the local paper, which was sent free to the Township office and to each of the Township commissioners. (R.R. at 137–50, 346, 536–37; S.R.R. 101a–105a.) Ms. Incorvati, the Township secretary who completed the insurance application, was responsible for reading the local paper to check for placement of legal advertisements. (R.R. at 346, 536–37.) She testified, however, that she did not remember seeing any of the announcements introduced into evidence prior to her deposition. (R.R. at 538, 569–571.) Ms. In-

---

1. "Claims made" insurance requires the insurer to provide coverage for any claims brought by a third party against the insured during the policy period, regardless of the date on which the alleged wrongful act occurred. (R.R. at 423.)

2. Racketeer Influenced and Corrupt Organizations Act, Title IX of the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 941 (as amended), 18 U.S.C. §§ 1961–1968 (1988).

corvati also testified that she did not remember receiving a flyer, announcing a citizens' meeting, that had been sent to the homes of all Stowe Township residents. (R.R. at 571.)

Eventually, the Township retained an independent solicitor to stave off citizen outrage by working with a citizens' group to uncover evidence of wrongdoing. (R.R. at 266–71, 353, 545.) Ms. Incorvati attended and made tape recordings of all the Township meetings and compiled minutes of those meetings. (R.R. at 535–36.) Additionally, Ms. Incorvati received a letter on October 1, 1991, from the independent solicitor's law firm indicating the solicitor would be filing "periodic reports with you which will contain information which is not sensitive to the furtherance of our information [sic] and possible legal proceedings brought in connection therewith." (*Id.*)

Ultimately, the independent solicitor filed a second federal RICO action in February of 1992; however, that complaint was dismissed on June 8, 1993, due to the solicitor's lack of authority to file such a complaint without Board approval. (R.R. at 39a; appellant's brief at 29 and exhibit "B–1" and "B–2" thereto.)[3] A complaint was also prepared by the citizens' group with the help of counsel. (S.R.R. at 107a–192a.) This complaint was forwarded to the independent solicitor on February 4, 1992. (R.R. at 193a.)

While Ms. Incorvati admitted to attending and tape recording the Township meetings, she testified she did not believe the swirling controversy and threatened legal action rose to the level of a "threat of litigation" or the "probability of a claim" for purposes of questions 16 and 17 on the application for insurance because she had received no formal notice of a lawsuit. (R.R. at 554–555.) She also testified that she did not verify the correctness of her answers with the Town-ship solicitor or any of the Township commissioners. (R.R. at 550, 580–583.)

At the conclusion of testimony, the trial court, the Honorable Joseph James, submitted the following four special interrogatories to the jury:

1. Were the statements made by the Township of Stowe in the Application for Insurance false?

2. Were the statements material to the risk?

3. Did the Township of Stowe know the statements to be false?

4. Were the statements made in bad faith?

R. at 48. The trial court then charged the jury that it was Tudor's burden to prove each of these propositions by a preponderance of the evidence, and directed the jury to answer "Yes" to question number 2. (R.R. at 760–62.)

Following deliberation, the jury answered "Yes" to the remaining questions and returned a verdict for Tudor and against Stowe on March 15, 1994. (R. at 49.) Post-trial motions were untimely filed on March 29, 1994; however, the trial court denied Tudor's motion to strike, instead denying Stowe's post-trial motions by order dated April 25, 1994 and filed April 26, 1994. (R.R. at 4a, 145a, 146a.) Then, on May 13, 1994, the trial court entered an order molding the verdict to reflect that the policy of insurance was void *ab initio.* (R.R. at 147a.)

Stowe claimed it had not received notice of the denial of its post-trial motions, and also that the order denying post-trial motions had not been docketed at the time the May 13, 1994 order was entered.[4] As a result, a hearing was held on August 3, 1994, following which the trial court entered a second order

---

3. We have not been able to locate in the certified record the federal court order dismissing the independent solicitor's RICO complaint. Our *Rules of Appellate Procedure* clearly provide that "those documents which are not part of the 'official record' forwarded to this Court are considered to be non-existent.... And, these deficiencies may not be remedied by inclusion in a brief in the form of a reproduced record." *Gocek v. Gocek*, 417 Pa.Super. 406, 411 n. 5, 612 A.2d 1004, 1006–07 n. 5 (1992). Nevertheless, our review of the notes of testimony indicates the independent solicitor testified regarding the dismissal of the federal complaint. (Notes of testimony, 3/9/94 at 243.) As a result, we may consider the facts of the dismissal.

4. The docket entries reflect that only that portion of the April 25, 1994 order denying Tudor's motion to strike the post-trial motions as untimely was docketed on April 26, 1994.

denying Stowe's post-trial motions and molding the verdict. (Notes of testimony, 8/3/94 at 2–19, R. at 65; R.R. at 148a.) Stowe timely filed an appeal to this court on August 11, 1994; however, by *per curiam* order, the appeal was quashed on January 4, 1995.

On December 13, 1995, the Honorable Stanton R. Wettick entered an order disposing of outstanding claims for attorneys' fees and dismissing the remaining claims, thus ending the litigation. Stowe then timely filed a notice of appeal on January 12, 1996, and an amended notice of appeal on March 13, 1996. (R.R. at 140a, 142a.) Tudor filed a motion to quash the amended appeal on March 26, 1996, which motion was denied by this court in a *per curiam* order entered May 23, 1996. Following oral argument, we remanded to the trial court, the Honorable Joseph M. James, to file a Rule 1925(a) opinion, but retained jurisdiction. Judge James' opinion having been filed, we are prepared to address Stowe's issues. We begin, however, with an issue raised by Tudor; namely, whether the appeal should be dismissed for lack of jurisdiction. (Tudor's brief at 12.)

The gravamen of Tudor's argument is that the amended notice of appeal is characterized as an appeal "from the Order entered in this matter on the 3rd day of August, 1994 (the Final Order disposed of all remaining issues being entered on the 13th day of December, 1995)." (R.R. at 142a.) According to Tudor, because the amended notice of appeal does not challenge the December 13, 1995 order ending all cross-claims among the defendants, Stowe is improperly challenging an interlocutory order (the August 3, 1994 order). (Tudor's brief at 12.) We find this argument meritless.

First, this court has already denied Tudor's motion to quash based upon the same jurisdictional argument. " 'The doctrine of the "law of the case" provides that where an appellate court has considered and decided a question on appeal, that court will not, in a subsequent appeal of another phase of the same case, reconsider its previous ruling.' " *Burrell Construction & Supply Co. v. Straub,* 440 Pa.Super. 596, 602, 656 A.2d 529, 532 (1995), *allocatur denied,* 542 Pa. 655, 668 A.2d 1120 (1995), *quoting Syno*

*v. Syno,* 406 Pa.Super. 218, 229, 594 A.2d 307, 313 (1991), *allocatur denied,* 529 Pa. 642, 600 A.2d 1259 (1991) (other citations omitted). As a result, we will not revisit this issue.

Additionally, we note that we dismissed Stowe's appeal from the August 3, 1994 order as interlocutory: to dismiss Stowe's appeal now, after a final order is entered, based on its alleged untimeliness would effectively deny Stowe the opportunity to challenge the August 3, 1994 order. As Judge Wettick's January 30, 1996 order states, the December 13, 1995 order "enabled Stowe Township to file appeals to other orders of court entered in these proceedings." (R.R. at 151a.) We turn next to Stowe's issues.

Stowe raises seven issues on appeal:

1. Whether the Trial Court committed an error of law or abuse of discretion by instructing the jury that the standard of proof was by preponderance of the evidence rather than by clear and convincing evidence?

2. Whether the Trial Court committed an error of law or abuse of discretion by:

 A) Allowing the introduction of the Township's application for insurance into evidence when it was not attached to the Township's policy as issued by Tudor Insurance Company; contrary to 40 P.S. § 441.

 B) Failing to instruct the jury regarding Tudor's duty to explain the policy exclusions and its duty to defend under the contract?

3. Whether the Trial Court committed an error of law or abuse of discretion in its failure to instruct the jury regarding the severability clause in the Township's insurance policy?

4. Whether the Trial Court committed an error of law or abuse of discretion in its failure to instruct the jury and in precluding the introduction of evidence regarding the provisions of 42 Pa. C.S.A. § 5522?

5. Whether the Trial Court committed an error of law or abuse of discretion by allowing conflicting evidence to be introduced regarding the authority of

the Independent Solicitor under Township's Ordinance 742, contrary to Federal Court Orders on that issue?

6. Whether the Trial Court committed an error of law or abuse of discretion by not instructing the jury regarding the Township's disclosure on the insurance application of the Grand Jury investigation and indictments and the sufficiency thereof to put the insurance company on notice to investigate?

7. Whether the Trial Court committed an error of law or abuse of discretion by upholding the jury verdict finding bad faith on the part of the Township absent evidence in support thereof?

Stowe's brief at 3. We begin with Stowe's first issue.

Prior to charging the jury, the trial court heard extensive argument by the parties on the appropriate burden of proof: Stowe argued that the standard was "clear and convincing," while Tudor argued that the standard was "by a preponderance." (R.R. at 687–703.) The court noted that cases in which an insurer sought to rescind a policy of insurance based upon misrepresentations merely set forth the elements noted *supra* as interrogatories, but remained silent as to the quality of evidence [5] necessary to establish those prongs. (R.R. at 697.) *See, for example, A.G. Allebach v. Hurley,* 373 Pa.Super. 41, 52, 540 A.2d 289, 294 (1988) (holding that "In order for an insurer to carry its burden of proving misrepresentation, it must show that the representation was false, that the subject matter was material to the risk, and that the applicant knew it to be false and made the representation in bad faith"). Tudor argued, however, that the silence of the courts applying the three-prong test should be construed to mean the preponderance standard was used. (R.R. at 685–86, 697.) Stowe, on the other hand, argued that the law is so settled on the standard necessary to prove fraud that the courts setting forth the elements of misrepresentation saw no need to articulate the "clear and convincing" standard. (R.R. at 699.)

In its opinion, the trial court observed that at common law, fraud was never presumed, but had to be proven by clear and convincing evidence. (Trial court opinion, 1/21/97 at 5.) The court then noted that Tudor did not rely upon common law fraud to void the policy; rather, it relied upon misrepresentations in an insurance policy. The court then opined, "[M]isrepresentation need not be proven by clear and convincing evidence since an answer known by the insured to be false when made is presumptively fraudulent." (*Id.,* citing *Baldwin v. Prudential Insurance Co.,* 215 Pa.Super. 434, 435–36, 258 A.2d 660, 661 (1969).) The court also relied upon *Allebach, supra* at 52–54, 540 A.2d at 295, for the proposition that "[a]n insurance company attempting to void an insurance policy for false statements in an application, is entitled to a presumption of fraud upon proof that the insured knowingly provided false answers." (Trial court opinion, 1/21/97 at 5.)

We have no disagreement with the legal propositions set forth by the trial court; however, we cannot agree with the underlying logic of its conclusion that an insurer's entitlement to a presumption of fraud *upon proof* of knowing falsity necessarily eliminates the possibility that the insurer bears the burden of proving such knowing falsity by clear and convincing evidence. Additionally, while we recognize that Tudor was not alleging common law fraud, we cannot agree that fraud in an insurance application is so intrinsically different from common law fraud that it warrants a lesser burden of proof: fraud is fraud. A cursory glance at the elements of the two causes of action supports this view.

■ The first two elements of common law fraud require the pleader to prove a fraudulent utterance of a misrepresentation, while insurance fraud requires a pleader to prove a false statement in an insurance application, which the applicant knew was false or otherwise made in bad faith. The third, fourth, and fifth elements of common law fraud necessitate proving an intent by the maker that the recipient be induced to rely on the misrepresentation, and justifiable reliance by,

5. *See Suravitz v. Prudential Insurance Co. of America,* 261 Pa. 390, 397–401, 104 A. 754, 755– 757 (1918), for the distinction between the weight and the quality of evidence.

and damage to, the recipient. Insurance fraud, on the other hand, requires the pleader to prove that the subject matter of the false statement was material to the risk assumed by the insurer; in other words, that the insurer relied to its detriment on the false statement in issuing the insurance policy. From the foregoing, it is patently clear that an insurer seeking to avoid an insurance policy is required to prove the same thing, dressed in different language, as a party alleging common law fraud.

█ Our search of the literature further supports our conclusion that the presumption of fraud upon which Tudor and the trial court so heavily rely only comes into play after an insurer has proven, by clear and convincing evidence, that, on the application, the insured knowingly made false statements that were material to the risk against which the insured sought to be protected. In *New York Life Insurance Co. v. Brandwene*, 316 Pa. 218, 172 A. 669 (1934), New York Life sought to rescind a disability insurance policy based upon allegations of fraud and misrepresentation in the application for insurance. As our supreme court noted:

> Fraud is, of course, a familiar source of equity jurisdiction, and it is well settled that one who has been induced to enter into a formal contract by the fraud of the other party may in a proper case secure the assistance of a court of equity, which will order the fraudulent party to surrender for cancellation the instrument evidencing the contract[.] Thus, where the execution of a contract of insurance has been induced by fraudulent misrepresentations of the insured, the insurer may secure its cancellation[.] The burden of proving the fraud is, of course, upon the party who alleges it, and it must be established by clear and satisfactory evidence.

*Id.* at 220–21, 172 A. at 669 (citations and footnotes omitted). The "clear and satisfactory" language used by the *Brandwene* court, in reliance on *Suravitz v. Prudential Insurance Co.*, 261 Pa. 390, 104 A. 754 (1918), has been equated in subsequent decisions of our supreme court with "clear and convincing evidence." *Gerfin v. Colonial Smelting & Refining Co.*, 374 Pa. 66, 67, 97 A.2d 71, 72

(1953), *citing Brandwene, supra,* and *Suravitz, supra; Wagner v. Somerset County Memorial Park,* 372 Pa. 338, 339–41, 93 A.2d 440, 441 (1953), *citing Brandwene, supra,* and *Suravitz, supra, overruled on other grounds sub nom. Smith v. Bell Telephone Co. of Pa.,* 397 Pa. 134, 153 A.2d 477 (1959).

We find additional support for our conclusion that insurance fraud should require an insurer to meet the same burden of proof required for common law fraud in the following language of our supreme court in *Evans v. Penn Mutual Life Insurance Co.,* 322 Pa. 547, 186 A. 133 (1936):

> The insurer must thus establish, in order to avoid the policy in the case of representations, that the statements relied on were falsely and *fraudulently* made. It is sufficient to show that they were false in fact and that insured knew they were false when he made them, *since an answer known by insured to be false when made is presumptively fraudulent. Fraud* may also be assumed from a showing that insured made false statements although fully aware that he did not know whether or not they were true, and that they had a tendency to and did mislead the insurer. . . . In any event, the controlling factor is the good faith of the insured, *and the burden of showing fraud is on the insurer,* who asserts it.

*Id.* at 553–555, 186 A. at 138–139 (emphasis added) (citations omitted). This language clearly indicates that an insurer seeking to avoid an insurance policy is entitled to a presumption of fraud *only after* it has proven that an insured knowingly answered questions falsely; nothing in this language indicates an insurer is entitled to a lesser burden of proof on the elements it must still prove. *See also Allebach, supra; Baldwin, supra.*

Further support for the importance of an insurer's proving knowing falsity before it is entitled to a presumption of fraud is found in a subsequent decision by our supreme court relying upon the following language in *Evans, supra,* to reverse a trial court's finding that an insurance policy was void *ab initio:*

> 'Mere mistakes, inadvertently made, even though of material matters, or the failure to furnish all details asked for, where it

appears there is no intention of concealing the truth, does not work a forfeiture, and a forfeiture does not follow where there has been no deliberate intent to deceive, and the known falsity of the answer is not affirmatively shown.'

*Allstate Insurance Co. v. Stinger,* 400 Pa. 533, 538–39, 163 A.2d 74, 77 (1960), *quoting Evans, supra* at 563, 186 A. at 143. Nothing in this language leads us to conclude that an insurer should bear a lesser burden when seeking a *presumption* of fraud than others bear when seeking to *prove* fraud.

We note further that a recent panel of this court acknowledged that the standard for an insurer seeking to avoid an insurance policy is that of proving fraudulent misrepresentation by clear and convincing evidence. *Kearns v. Philadelphia Life Insurance Co.,* 401 Pa.Super. 292, 298–99, 585 A.2d 53, 56 (1991), *allocatur denied,* 528 Pa. 631, 598 A.2d 284 (1991). *See also Batka v. Liberty Mutual Fire Insurance Co.,* 704 F.2d 684, 687 (3d Cir.1983) (holding that under Pennsylvania law, an insurer must establish the defense of fraud in an application for insurance by clear, precise, and indubitable evidence).

■ We thus find that the jury instantly should have been instructed to determine whether there was clear and convincing evidence Stowe had knowingly falsified the application for insurance or otherwise acted in bad faith.[6] If the jury concluded that Stowe knowingly falsified the application, then the jury could presume fraud, or bad faith; Tudor was not then required to prove Stowe's motivation for knowing falsification. If, however, the jury did not find a "knowing" falsification, then Tudor would have had to show, by clear and convincing evidence, that Stowe otherwise acted in bad faith when it answered the questions on the application incorrectly. For example, Tudor could have

proven that, while Ms. Incorvati may have been unsure as to the correct answer to questions 16 and 17, nevertheless, she knew that if she divulged the swirling controversy to Tudor, it would not insure the Township, so she deliberately erred on the side of non-disclosure.

■ A charge on a weaker burden of proof than that required by law constitutes an error of law that may well control the outcome of the case; therefore, we are required to reverse and remand for a new trial. *See Empire Properties, Inc. v. Equireal, Inc.,* 449 Pa.Super. 476, 489–90, 674 A.2d 297, 304 (1996) (remanding for a new trial where the trial court instructions permitted the jury to find an oral modification of a written contract by a fair preponderance of the evidence, rather than by the appropriate clear and convincing standard).

■ In the first part of its second issue, Stowe claims the trial court erred when it allowed the application for insurance to be admitted into evidence despite the clear mandate of 40 P.S. § 441 which provides:

All insurance policies, issued by stock or mutual insurance companies or associations doing business in this State, in which the application of the insured ... form[s] part of the policy or contract between the parties thereto ... shall contain, or have attached to said policies, correct copies of the application as signed by the applicant ...; and, unless so attached and accompanying the policy, no such application ... shall be received in evidence in any controversy between the parties to ... the policy, nor shall such application ... be considered a part of the policy ... between parties.

40 P.S. § 441.

The trial court heard extensive argument on Stowe's motion *in limine* seeking to pre-

---

6. We arc aware that any objections to the jury charge must be lodged at trial and on the record. *Pagesh v. Ucman,* 403 Pa.Super. 549, 551–53, 589 A.2d 747, 748 (1991), *citing* Pa. R.A.P 302, 42 Pa.C.S.A. We are also aware that Stowe did not object to the charge on the preponderance of the evidence at the time it was given. (R.R. at 769.) Nevertheless, the trial court noted Stowe's objection on the record during oral argument when it denied Stowe's requested point for charge on the "clear and convincing" standard,

and promised to "make that determination clearly depending on the verdict." (R.R. at 703.) Additionally, at the close of the conference on the requested points for charge, the parties asked the court if their objections to the trial court's rulings on the points were preserved, or if they were required to make a contemporaneous objection. (R.R. at 719.) The trial court replied that it had formally recorded the conference in order to preserve issues raised therein. (*Id.*) As a result, we find the issue preserved.

clude the introduction of the insurance application, without which Tudor's misrepresentation claim would have collapsed. (R.R. at 460–501.) On appeal, Stowe argues that the statute applies to Tudor because Tudor does business in Pennsylvania, and that the statute is to be strictly construed, and does not allow of exceptions. (Stowe's brief at 16, 17.) Stowe also argues that by the terms of Tudor's policy, the application was required to be attached to the policy. (*Id.* at 19.) Finally, Stowe argues that Tudor presented no evidence the application was attached to the policy, while Stowe presented the testimony of three witnesses in the "chain of command" that the application was not attached. (*Id.* at 15.)

Tudor, on the other hand, argues that, because it is a "surplus lines carrier," [7] and is covered by a different statute, 40 P.S. § 441 does not apply to it. (Tudor's brief at 23.) In support of this proposition, Tudor cites *Layman v. Continental Assurance Co.*, 416 Pa. 155, 205 A.2d 93 (1964), in which our supreme court rejected application of § 441 to group health insurance policies because there were separate statutory provisions covering group health insurance. (Tudor's brief at 24.) Additionally, Tudor argues that it did, in fact, introduce evidence that the application was attached to the policy: Tudor's vice president in charge of establishing underwriting procedures testified that it was the custom and practice of Tudor to attach applications to policies when issuing them.[8] (*Id.* at 22.)

At oral argument on the motion *in limine,* the trial court attempted to weigh the equities. (R.R. at 494.) First, it noted that Stowe acknowledged having a copy of the application containing its alleged misrepresentations, so that it was not prejudiced by Tudor's alleged failure to attach the application to the policy of insurance. (R.R. at 494.) The trial court also noted the purpose of § 441; namely, to keep before the insured all the terms of its contract, including those upon which the insurer might rely in seeking to resist payment, and to protect the insured from fraud by the insurer, which might substitute a "doctored" application. (R.R. at 493.) Finally, the court observed that, because of Tudor's status as a surplus lines carrier, it is not permitted to have direct contact with the insured, but has to rely upon intermediaries to deliver the policy to the insured. (R.R. at 483.) As a result of the foregoing, the trial court ruled that § 441 did not apply to the policy in question, but that evidence of the terms of the policy, referencing attachment of the application, would go to the jury for whatever weight they might assign to such evidence. (R.R. at 493–97.)

We note first that "questions concerned with the admission or exclusion of evidence are within the sound discretion of the trial court." *Lewis v. Mellor,* 259 Pa.Super. 509, 515, 393 A.2d 941, 944 (1978) (*en banc*). Nevertheless, a trial court's conclusions of law are not binding on an appellate court, whose duty it is to determine whether the law was properly applied to the facts of a case. *Thatcher's Drug Store of West Goshen, Inc. v. Consolidated Supermarkets, Inc.,* 535 Pa. 469, 476–78, 636 A.2d 156, 160 (1994). Having conducted a plenary review of the facts and the law, and having discovered no cases that directly address the applicability of § 441 to surplus lines carriers, we cannot find that the trial court erred as a matter of

---

7. A surplus lines carrier is an unlicensed insurer designated by the insurance commissioner to provide insurance to Pennsylvanians which they would not otherwise be able to procure, provided that a licensed agent has made a diligent effort to procure such insurance from a licensed insurer, that the premium charged is not lower than the lowest premium approved by the commissioner for use by a licensed insurer, and that the policy or contract used by the surplus lines insurer does not differ materially from policies or contracts customarily used by licensed insurers. 40 P.S. § 1006.4 (repealed, now 40 P.S. § 991.1604).

8. We note that the trial court erred when it allowed Tudor to introduce into evidence the testimony of its vice president that it was Tudor's "custom and practice" to attach applications to newly issued insurance policies. *See Custer v. Fidelity Mutual Aid Association,* 211 Pa. 257, 262–63, 60 A. 776, 778 (1905) (holding that evidence of the custom of a company in attaching a copy of the application to policies when issued is inadmissible, unless corroborative of other evidence, to show that the application had been attached to a particular policy when that fact is in controversy).

law in refusing to apply § 441 to the facts of this case.

█ As the trial court noted and as the case law makes clear, § 441 is to be construed strictly; however, it is also to be construed reasonably. *Ross v. Metropolitan Life Insurance Co.*, 403 Pa. 135, 142–43, 169 A.2d 74, 78 (1961); *Allebach, supra* at 50–52, 540 A.2d at 294. We take guidance from *Allebach*.

In *Allebach*, Allebach purchased a fire insurance policy from Hurley, an insurance agent. When Allebach's building was damaged by fire, he discovered that the policy in question did not provide coverage for all of the types of damage he incurred. He therefore notified Hurley that a suit would be brought against him. As a result, Hurley applied to Utica for an errors and omissions policy, in which he answered "no" on one application to the question whether the applicant knew of any circumstances or allegations which might result in a claim being made against the agency, and in which he left blank the answer to that question on a second application. The policy provided that any blanks would be deemed to have been answered in the negative. *Id.* at 44–46, 540 A.2d at 291.

Ultimately, Allebach filed two lawsuits against Hurley. Allebach and Hurley settled, with Hurley assigning his rights under the Utica policy to Allebach as part of the settlement. When Utica refused payment to Allebach based upon the misrepresentation in the application for insurance, Allebach raised § 441, claiming that, because two applications existed, the copy attached to the policy was not an "exact" copy for purposes of the statute. In allowing the defense of misrepresentation based on the application, this court noted that the two applications were for all purposes the same; there was no question Hurley signed both forms; and there was no question Hurley received the policy he requested. *Id.* at 50–52, 540 A.2d at 294. As this court noted, it was not presented with a case "in which the insurance company is attempting to confuse an ignorant insured with a long and complicated policy application." *Id.*

The same can be said instantly. Stowe admitted in its answer that its secretary had filled out the insurance application in the manner complained of. (R. at 4.) Stowe never alleged that it lacked notice of its answers, or that it did not have a copy of the application. As the trial court observed, and as the case law makes clear:

> It is well known that the evil aimed at in this legislation was the custom of insurance companies to put in their blank forms of application long and intricate questions or statements to be answered or made by the applicant, printed usually in very small type, and the relevancy or materiality not always apparent to the inexperienced, and therefore liable to become traps to catch even the innocent unwary. The general intent was to keep these statements before the eyes of the insured, so that he might know his contract, and if it contained errors, have them rectified before it became too late.

*Lennox v. Greenwich Insurance Co.*, 165 Pa. 575, 577, 30 A. 940, 941 (1895). None of the evils described in *Lennox* is present instantly.

Additionally, we agree with Tudor that reason and fairness should not require a surplus lines carrier to relinquish a claim of misrepresentation because its policy does not arrive intact in the hands of the insured, when that policy, by statute, cannot travel directly from the carrier to the insured. In the instant case, for example, the policy traveled from Tudor to Delaware Valley Underwriters to HDH Group to the W.J. Kellar Agency before arriving in the hands of the Township secretary. Based on the foregoing, we find no merit to Stowe's issue 2.A.

As to Stowe's issues 2.B, 3, 4, and 6 insofar as they allege trial court error in its instructions to the jury, we decline to address these issues because we are remanding for a new trial. Insofar as issue 4 also alleges trial court error in refusing to admit into evidence the provisions of 42 Pa.C.S.A. § 5522, we will address it to provide guidance to the trial court on remand. We note again, however, our deferential standard when reviewing a trial court's evidentiary rulings, set forth *supra*.

 Section 5522 provides in pertinent part that written notice of intent to file a suit must be brought against a government unit within six months from the date on which any injury was sustained or cause of action accrued, and that, *no written notice having been sent by the citizens' group within six months,* the Township was entitled to rely upon the statute in completing its insurance application. We find this issue meritless because § 5522 is irrelevant. The insurance application did not ask whether the Township or any of its commissioners knew about legitimate suites for which there existed no viable defense; rather, it asked whether the Township was aware of *any* threat of litigation. (R.R. at 29a.) Section 5522 may have provided the Township with a legitimate defense against a lawsuit; however, Tudor would still have been required to defend, regardless of the frivolity of the claim brought. As this court noted in *D'Auria v. Zurich Insurance Co.,* 352 Pa.Super. 231, 507 A.2d 857 (1986):

> The duty to defend is separate from and greater than the duty to indemnify. In purchasing insurance, the appellant here purchased not only the insurer's duty to indemnify when claims which fall within the policy's coverage are successful, but also protection against those groundless, false or fraudulent claims *regardless* of the insurer's ultimate liability to pay.

*Id.* at 233–34, 507 A.2d at 859 (emphasis in original) (citation omitted).

 As to Stowe's issue 5, we again find irrelevant to *this* case a federal court order dismissing the federal RICO claim brought by the independent solicitor because he lacked authority under Township Ordinance 742 to bring such a case without the approval of the Board of Commissioners. As a result, we cannot agree with Stowe that the trial court erred when it allowed evidence of the federal RICO claim to be admitted into evidence, thus according to Stowe, introducing "conflicting" evidence as to the independent solicitor's authority under the Ordinance. Once again, the issue is not whether the independent solicitor had authority to bring a legitimate claim; the issue is whether the Township knew the independent solicitor was threatening to bring a claim, legitimate, au-

thorized, or otherwise. As with issue 4, regardless of the merit of the claim, Tudor would have had a duty to defend.

Finally, Stowe claims that the jury verdict of bad faith was against the weight of the evidence and was unsupported by the evidence, such that the trial court erred by not granting judgment n.o.v. or awarding a new trial. (Stowe's brief at 34.) Because our resolution of issue 1 requires us to remand for a new trial in which the trial court must charge the jury on a more stringent burden of proof, we decline to address this issue at this time.

For all of the foregoing reasons, we affirm in part, reverse in part, and remand for a new trial. Jurisdiction is relinquished.