# TJS Brokerage & Co. v. Hartford Casualty Insurance Co.

*John N. Ellison,* for plaintiff.
*Patrick J. Keenan* and *Thomas Close,* for defendants.

HERRON, *J.,* April 24, 2000—This case involves a dispute over an insurance adjustment. In April 1999, plaintiff-petitioner TJS Brokerage & Co. lost much of its office equipment when the brother of the TJS president vandalized the office. TJS submitted claims to its insurer, defendant-respondent Hartford Casualty Insurance Co. for damaged property, damaged computers, valuable papers and lost business income. After paying some of the claims, Hartford stopped paying.

TJS filed this petition for a preliminary injunction, requesting that the court order Hartford to continue to process the claims. TJS argues that, if Hartford does not reimburse TJS for the damaged property and the lost

business income, TJS will go out of business. Hartford argues that TJS did not submit enough information to allow Hartford to adjust the claims and that TJS's claims are fraudulent.

The court grants the petition in part. TJS has demonstrated all the requirements for a preliminary injunction. Most importantly, the threat to TJS's business is an imminent, irreparable harm that cannot be compensated by money damages. The court finds no support in the record for Hartford's allegations of fraud. However, TJS's right to relief is clear only on its business personal property and valuable papers claims. Because the right to relief on the business income claims is not clear, the court will only order Hartford to process the property and valuable papers claims.

## FINDINGS OF FACT

(1) On December 22, 1999, plaintiff-petitioner TJS filed a complaint against Hartford, and defendant Peterman Company. The complaint alleged breach of an insurance contract and bad faith against Hartford, and negligence and breach of contract against the Peterman Company.

(2) On December 27, 1999, TJS filed a petition for a preliminary injunction against Hartford.

(3) The court conducted a hearing on the petition for preliminary injunction on February 23 and 24 and March 2, 2000. The court heard oral argument on March 3, 2000.

### I. *The Parties*

(4) TJS is a Pennsylvania corporation located at 4940 Disston Street, Philadelphia, Pennsylvania. (N.T. 35.) TJS is a transportation broker. Customers contact TJS with freight to be shipped, and TJS arranges for trucking companies to carry the freight. (Exhibit P-106; Sicalides aff. ¶¶3, 5.)

(5) Thomas J. Sicalides is the president and sole shareholder of TJS. (N.T. 361.) In addition, he owns or did own, in whole or in part, the following companies: Keystone Transportation Inc., Garden State Transportation Inc., Beverly Hills Sales and Marketing Inc., Michael's Transport Inc. and T&T Freight Consolidators. (N.T. 362-67.)

(6) Hartford is an Indiana corporation, engaged in the business of selling insurance policies and located at Hartford Plaza, Hartford, Connecticut.

(7) Peterman Company is a Pennsylvania corporation engaged in the insurance brokerage business and located at 829 N. Bethlehem Pike, Spring House, Pennsylvania.

(8) Peterman Company is an insurance agent for Hartford and an insurance broker for TJS. (N.T. 54-55, 240.)

(9) Thomas Peterman is president of Peterman Company.[1] (N.T. 54.)

## II. *The Insurance Policy*

(10) Through the Peterman Company, Hartford sold a multi-risk insurance policy, no. 39UUCLE4914 to TJS. (N.T. 384; exhibit P-108.) The policy was effective from June 18, 1998 to June 18, 1999. (Exhibit P-108.)

(11) The named insureds under the policy are TJS, Keystone Transportation Inc., Garden State Transportation Inc., Beverly Hills Sales and Marketing Inc., Thomas Sicalides, Michael's Transport Inc. and T&T Freight Consolidators. (Exhibit P-108, form IH 12 00 11 85.)

(12) Among other coverage, the policy included: (a) business income loss coverage of $1,200,000 with 80 percent co-insurance,[2] (b) business personal property

---

1. This memorandum refers to Peterman the individual as "Peterman" and Peterman's company as "Peterman Company."

2. Co-insurance serves as a penalty to the insured who purchases insurance that covers less than all of his property or business income. If the co-insurance figure is 80 percent, the dollar limit of the insur-

coverage of $350,000 with a $500 deductible and 80 percent co-insurance, (c) computer equipment coverage of $350,000 with 80 percent co-insurance,[3] and (d) valuable papers coverage of $100,000 with a $250 deductible and no co-insurance. (Exhibit P-108; N.T. 55-56.)

(13) TJS purchased additional coverage such that the policy covered the full replacement cost of business personal property and computer equipment that was actually replaced. (Exhibit P-108, form HP 19 05 11 85T; N.T. 65, 104.)

### III. *The April 2, 1999 Vandalism Incident*

(14) On April 2, 1999, Vincent Sicalides vandalized the offices of TJS at 4940 Disston Street, the TJS warehouse, and the neighboring offices of T&T Freight Consolidators and Michael's Trucking at 6918 State Road. Vincent Sicalides is Thomas Sicalides' brother. (N.T. 13-22, 70.)

(15) TJS employees Gary Krinick and Steven Horvay were present at the TJS offices during the vandalism.

---

ance purchased must equal 80 percent of the dollar value of the covered property or income. Under the policy, if the insured underinsures his property, the insurer pays only a percentage of the actual loss based on the following equation:

$$\frac{\text{Insurance limit}}{\text{Total amount of property or business income}} \quad \times \quad \frac{\text{Amount of loss}}{\text{Co-insurance percent}} \quad - \text{ deductible} = \text{maximum amount payable}$$

(Exhibit P-108, forms CP 00 10 06 95 at 8 and CP 00 30 06 95 at 5; N.T. 104-105 and 138.)

3. Under the terms of the policy, there seems to be a $1,000 deductible for the computer coverage. (Exhibit P-108, form MS 19 09 04 89T.) Yet Hartford seems not to have applied a deductible to TJS's computer claim. (Exhibit C-1.)

(N.T. 12-52.) Police arrived and took Vincent Sicalides into custody. (N.T. 15-16.)

(16) TJS submitted claims to Hartford for business personal property, computer equipment, valuable papers and business income losses. (N.T. 67-68.)

(17) Within days of the vandalism incident, Peterman and Alan Mycek, the Hartford adjuster who handled TJS's claim, visited the TJS premises. (N.T. 69.) Peterman and Mycek walked through the premises and inspected the damage. (N.T. 69-70.) Mycek took statements of witnesses and inventoried and photographed the damage. (N.T. 301-306; exhibits D-31, D-32 and P-29.)

(18) On April 26, 1999, Mycek audio recorded a statement of Thomas Sicalides. (N.T. 300-302; exhibit D-3.)

(19) Between April 19, 1999 and June 18, 1999, Hartford processed TJS's claims and tendered eight checks to TJS totaling $533,297.15. (Exhibits P-39, P-124; N.T. 252-53.) See also, findings of fact ¶¶28, 29, 52.

(20) In September and October 1999, counsel for Hartford conducted examinations under oath of Gary Krinick, Steven Horvay and Tom Sicalides. (N.T. 544.)

IV. *The Business Income Loss Claim*

(21) The policy provides that Hartford "will pay for the actual loss of business income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.' " (Exhibit P-108, form CP 00 30 06 95 at 1.)

(22) "Business income means the: (a) net income (net profit or loss before income taxes) that would have been earned or incurred; and (b) continuing normal operating expenses, including payroll." (Exhibit P-108, form CP 00 30 06 95 at 1.)

(23) The business income loss determination is based on

"(1) The net income of the business before the direct physical loss or damage occurred;

"(2) The likely net income of the business if no physical loss or damage had occurred, but not including any net income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the covered cause of loss on customers or on other businesses.

"(3) The operating expenses, including payroll expenses, necessary to resume 'operations' with the same quality of service that existed just before the direct physical loss or damage; and

"(4) Other relevant sources of information, including:

"(a) Your financial records and accounting procedures;

"(b) Bills, invoices and other vouchers; and

"(c) Deeds, liens or contracts." (Exhibit P-108, form CP 00 30 06 95 at 4-5.)

(24) To determine whether the co-insurance provision applies, the policy provides that Hartford project the net income and operating expenses for all named insureds[4] had no loss occurred for June 18, 1998 to June 18, 1999— the 12-month period following the inception date of the policy. (Exhibit P-108, form CP 00 30 06 95 at 1, 5; N.T. 138, 139, 154.)

---

4. Though TJS argues otherwise, the co-insurance and duties provisions clearly entitle Hartford to information from the other named insureds. The "you" and "your" in those provisions refer to the named insureds shown in the declarations of the policy. (Exhibit P-108, CP 00 30 06 95, page 1 of 8.)

(25) The policy imposes the following duties on the insured with regard to the business income loss claim:

"*(5) Duties in the event of loss*

"You must see that the following are done in the event of loss: . . .

"(5) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

"Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

"(6) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

"(7) Cooperate with us in the investigation or settlement of the claim." (Exhibit P-108, form CP 00 30 06 95 at 3-4.)

(26) Provided that TJS has complied with all terms of the business income loss coverage provisions, and Hartford and TJS have reached an agreement on the amount of loss, the policy requires Hartford to pay all covered business income losses within 30 days after receiving a sworn proof of loss. (Exhibit P-108, form CP 00 30 06 95 at 5.)

(27) In April 1999, Hartford hired the accounting firm of Matson, Driscoll & Damico to adjust the business income claim. (N.T. 128.) MD&D began requesting financial information from TJS as early as April 9, 1999. (Exhibit D-13.)

(28) On May 14, 1999, Hartford advanced $50,000 toward the April 1999 business income loss claim. (Exhibit P-124; N.T. 252-53.)

(29) On June 4, 1999, Hartford advanced $50,000 toward the May 1999 business income loss claim. (Exhibits P-29, P-124; N.T. 252-53.) In the cover letter of the advance, Hartford refused to advance TJS any additional money toward the business income loss claim because TJS and the other named insureds in the policy had not provided Hartford and MD&D with sufficient financial information to evaluate that claim. (Exhibit P-29.)

(30) Hartford needed financial information from the other named insureds for two reasons: (1) to confirm that TJS was not shifting business to the other named insureds to decrease TJS's revenues and thus inflate its losses, and (2) to confirm that the co-insurance provision was satisfied. (N.T. 137-39; exhibit P-108, form CP 00 30 06 95 at 5-6.)

(31) In the June 4, 1999 letter, Hartford made its first demand for a proof of loss for the business income. (Exhibit D-7.)

(32) On July 28, 1999, Hartford faxed TJS a proof of loss form. (Exhibit D-9.)

(33) In August 1999, TJS hired a public adjuster, Young Adjustment, to help prepare the business income loss claim. (N.T. 95.) On August 20, 1999, Young Adjustment sent a proof of loss to Hartford on TJS's behalf. (Exhibit D-12.)

(34) In a letter dated September 7, 1999, Mycek acknowledged receipt of the proof of loss. The letter did not reject the proof of loss or state that it was otherwise defective, but the letter made a reservation of rights. (Exhibit D-12A; N.T. 260.)

(35) Several factors complicated TJS's submission of the requested information.

(36) First, some of the requested financial information was purportedly stored on the hard drives of the damaged computers. (N.T. 92; exhibits D-8 and P-115.) Hartford offered to have the hard drives sent away to a vendor to retrieve the information. (Exhibits D-8 and P-115.) TJS declined and stated that it would retrieve the information on its own. (Exhibit D-8.) It is not clear whether TJS ever retrieved the information from the hard drives or sent it to Hartford. (N.T. 92.)

(37) Second, in July 1999, the Department of Transportation seized TJS's records. (N.T. 142-43; exhibit D-1.) The basis for the seizure is not in the record. There is no evidence in the record that the seizure is related to the April 2, 1999 vandalism or to TJS's insurance claim. On November 23, 1999, representatives of MD&D and TJS met at PennDOT offices to inspect the seized records and copy information needed to adjust TJS's business income loss claim. (N.T. 162-63; exhibit P-91.)

(38) Third, Hartford's requests for information were piecemeal (compare exhibits D-10, D-11, D-13, D-14, D-15, D-16, D-18, D-21 and D-83 *with* Hartford's proposed findings of fact ¶57), such that it is not clear exactly what information Hartford needed. (N.T. 92.)

(39) Fourth, TJS and the other named insureds appear to have been less than meticulous record keepers. Albert Schneider of Young Adjustment agreed that "[t]here was a lot of paperwork missing" from the financial information that TJS submitted in support of its business income loss claim. (N.T. 318.)

(40) Though neither Hartford nor TJS provided the court with a summary that compares the financial infor-

mation that Hartford requested with the financial information that TJS submitted, it appears that TJS has yet to submit information required by Hartford to adjust the business income claim. For instance, TJS has not provided Hartford with the earnings of the other named insureds for June 1998 to June 1999. Hartford needs this information to evaluate the co-insurance penalty. (N.T. 135-37, 153-54, 162; exhibit P-89.)

(41) On December 6, 1999, Hartford's counsel informed TJS that the proof of loss that TJS submitted was incomplete. (Exhibit D-11.)

## V. The Business Personal Property and Computer Equipment Claims

(42) The policy provides that Hartford will pay the actual cost value of lost or damaged business personal property and computer equipment. (Exhibit P-108, form CP 00 10 06 95 at 7.)

(43) The policy provides that Hartford will pay the replacement cost of lost or damaged business personal property and computer equipment that is actually repaired or replaced. (Exhibit P-108, form CP 00 10 06 95 at 11 and form MS 00 25 04 89 at 4.)

(44) The policy requires Hartford to give notice of its acceptance or denial of a property claim within 15 days after receiving a sworn proof of loss. (Exhibit P-108; Pennsylvania changes, form IL 01 72 11 93 at 1.)

(45) Mycek personally visited the TJS premises in early April 1999 and inspected and photographed the damaged equipment. (N.T. 387-88.)

(46) On May 6, 1999, Mycek requested from TJS a detailed list of all items claimed with values of the items. (Exhibit P-63.)

(47) On May 12, 1999, TJS faxed to Hartford an inventory of the equipment damaged in the incident and an estimate for the cost of each item. (Exhibit P-12.) On May 25, 1999, TJS faxed to Peterman a list of damage to the office. (Exhibit P-23.)

(48) At Hartford's request, TJS obtained estimates for replacement of various items of damaged equipment. (Exhibits P-2, P-7, P-8, P-11, P-18, P-22, P-27, P-32, P-55, P-56, P-57, P-58.) Mycek stated that there were no disputes as to valuation of the property replacement estimates, except for the computer equipment. (N.T. at 244, 391-92.)

(49) TJS stored the damaged equipment on TJS's premises and made the equipment available for Hartford's inspection. (N.T. 123; exhibits P-93, P-94, P-95, P-96, P-97.)

(50) Hartford did not request a proof of loss from TJS with regard to TJS's claims for business personal property, computer equipment or valuable papers losses. (N.T. 241-42; exhibit P-29.)

(51) Hartford admitted that there was no co-insurance problem with respect to TJS's claims for business personal property, computer equipment or valuable papers losses. (N.T. 246-47.)

(52) From April 19, 1999 to June 18, 1999, Hartford advanced $433,297.15 for TJS's business personal property and computer equipment claims.[5]

---

5. Counsel for TJS and Hartford stipulated that Hartford issued only five checks totaling $333,297.10 toward TJS's business personal property and business income loss claims. (N.T. 252-53.) However, the record shows that Hartford issued a sixth check for $80,000 toward the property claim. (Exhibits P-124, P-39.)

(53) On July 23, 1999, Stoner & Company, a salvage company, made a written inventory of the damaged equipment on Hartford's behalf. (Exhibit P-114.)

(54) Stoner returned on February 2, 2000 and completed the inventory. Stoner removed three copiers, a printer and nine dispatchers on Hartford's behalf. (Exhibit P-97.)

## A. The Phone Switch

(55) TJS's Meridian phone switch was damaged in the incident. (Exhibits C-1, C-2 and P-12, P-97 at 5.)

(56) The phone switch acts as a central server for TJS's phone system. The phones in TJS's office connect to the phone switch, which in turn connects to TJS's numerous outgoing phone lines. (N.T. 171-72.)

(57) Sprint gave TJS an estimate of $248,860 (tax not included) to replace the phone switch. (Exhibit P-57.)

(58) On April 15, 1999, TJS faxed the Sprint estimate to Mycek requesting permission to have the switch replaced and requesting a check for the replacement cost. (Exhibit P-57.) On April 16, 1999, Mycek authorized the replacement (Exhibit P-2.)

(59) On April 15, 1999, TJS sent Hartford a copy of a Sprint sales agreement reflecting a price of $263,731.60, which included 6 percent sales tax, for replacement of the switch. (Exhibits P-57, P-72, P-77.) On May 24, 1999, TJS sent Peterman a copy of the sales agreement with a typewritten footnote stating that the sales tax in the agreement had been calculated incorrectly. (Exhibit P-22.) As the note explains, Philadelphia sales tax is 7 percent, bringing the total cost to $266,280.20. (Exhibits P-72, P-77; N.T. 229-30, 477.) It is not clear whether Hartford received the copy of the agreement containing the sales

tax correction (see exhibit P-77, in which Mycek acknowledges receipt of a sales agreement for $263,731), or whether Hartford otherwise knew about the incorrectly calculated sales tax.[6]

(60) In accordance with an arrangement that Mycek authorized, Sprint installed a temporary phone switch in May 1999 to serve TJS while Sprint had a permanent switch custom-manufactured. (Exhibits P-1, P-2; N.T. 210-11.)

(61) Though Hartford and TJS originally understood that Sprint would install the permanent switch two weeks after installing the temporary switch (see exhibit P-57), there were several months of delay before Sprint installed the permanent switch. Mycek expressed concern about the delay. (Exhibits P-51, P-77, P-78.)

(62) Mycek blamed TJS for delaying the installation of the permanent phone switch, but nothing in the record indicates that TJS caused the delay. (N.T. 175, 209-215.)

(63) In or about August 1999, Sprint installed or began to install the permanent phone switch. (N.T. 207.)

(64) By late August or early September 1999, Mycek knew that the permanent phone switch had been replaced. (N.T. 207, 231.)

(65) TJS experienced problems with the operation of the permanent phone switch after its installation. (Ex-

---

6. The copies of the sales agreement in the record are not signed (exhibits P-22, P-57), which might raise an issue about whether TJS entered into a binding contract triggering Hartford's duty to pay the RCV of the phone switch. See *Gatti v. State Farm Fire & Casualty Co.,* no. 2469 Philadelphia 1998, slip op. J. A28006/99 at 4, 6 and 7 (Pa. Super. 1999). But correspondence from Mycek shows his knowledge that the agreement was signed on April 16, 1999. (Exhibit P-77.)

hibits P-81, P-112; N.T. 175-76.) As of February 23, 2000, the phone switch was not operating at full capacity. (N.T. 176.)

(66) Hartford's advances to TJS included $210,985.28 for the ACV of the phone switch, or $263,731.20 minus 20 percent depreciation.[7] (Exhibits C-2 and P-39, P-124.)

(67) The cost on which Hartford based its ACV included sales tax (calculated at 6 percent rather than 7 percent). (Exhibits C-2 and P-57.)

(68) Hartford has not paid TJS the 20 percent depreciation holdback for the phone switch. (N.T. 229-33.)

(69) Mycek offered two reasons for not paying the depreciation holdback for the phone switch: (1) TJS's failure to submit "a properly executed proof of loss," which Mycek characterized as the "main reason" (N.T. 233), and (2) TJS's failure to submit a final invoice for the phone switch. (N.T. 229-33.)

(70) Mycek does not think he requested a final invoice for the phone switch after learning that Sprint had installed the permanent phone switch. (N.T. 233.)

## B. The Computers

(71) TJS's computer system was damaged in the incident. (Exhibits C-1, C-2.)

(72) After some disagreement over the replacement cost of the computers, TJS and Hartford agreed to a replacement cost of $125,000. (Exhibit P-28; N.T. 76.)

---

7. Hartford's first payment on the phone switch was an April 21, 1999 check for $133,000 intended as a down payment for Sprint. (Exhibit P-124.) The remainder of the ACV was included as part of the later advances.

(73) TJS ordered a new computer system on May 20, 1999. (Exhibit P-68.) Peterman sent confirmation of the order to Mycek. (Exhibits P-69, P-70.)

(74) On June 2, 1999, TJS faxed Peterman a purchase order for the computers. (Exhibit P-27.) On June 3, 1999, Peterman's office faxed the purchase order to Mycek with a request for payment of the remainder of the money for the computers. (Exhibit P-74.) The purchase order reflects a price of $127,900.25 for the computers. (Exhibit P-74.)

(75) TJS now alleges an RCV for the computers of $133,750, or $125,000 plus 7 percent sales tax. (Exhibit C-2.)

(76) Hartford alleges, and has paid, an RCV of $133,744.60 for the computers. (Exhibits P-124 and C-2.) That figure corresponds to a May 20, 1999 purchase order from TJS, which listed a price of $133,744.65, or $124,995 plus 7 percent sales tax. (Exhibit P-68.)

(77) Hartford's advances to TJS included $100,308.45 for the ACV of the computers, or $133,744.60 minus 25 percent depreciation. (Exhibits C-2 and P-39, P-124.)

(78) In a check dated June 18, 1999, Hartford paid TJS the $33,436.15 depreciation holdback for the computers. (Exhibits C-2 and P-39, P-124; exhibit P-39; N.T. 281.)

(79) It is not clear front the record when the computers were delivered. Nothing in the record indicates that TJS sent Hartford any evidence of delivery of or payment for the computers. (N.T. 478, 480.) As of August 16, 1999, after having paid the depreciation holdback, Mycek apparently did not know whether the computers had been delivered. (Exhibit P-51.)

## C. The Copiers

(80) Three Canon photocopiers were damaged in the incident. (Exhibits C-1, C-2 and P-12, P-114.)

(81) The record shows that TJS obtained four estimates for replacement of these copiers, ranging from $98,963 to $106,298. (Exhibits P-7, P-12, P-46, P-58, P-75.)[8]

(82) TJS now claims an RCV of $105,930 for the three copiers.[9] (Exhibit C-1.)

(83) Hartford alleges an RCV of $78,374 for the three copiers (exhibit C-2), an RCV that Mycek noted in an earlier adjustment of TJS's claim. (Exhibit P-46.) However, Mycek changed this estimate to $88,907 on July 28, 1999. (Exhibit P-46.) It is not clear how Hartford arrived at these figures, whether the figures include sales tax, or why Hartford now reasserts the earlier and lower RCV.

(84) Hartford's advances to TJS included $62,699 for the ACV of the copiers, or $78,374 minus 20 percent depreciation. (Exhibits C-2 and P-39, P-46, P-124.)

(85) TJS did not replace the copiers. (N.T. 394.)

## D. The Shelving

(86) Shelving was damaged in the incident. (Exhibits C-1, C-2.)

(87) TJS alleges an RCV of $1,605, or $1,500 plus 7 percent tax. (Exhibits C-1 and P-12, P-39.)

(88) Hartford alleges an RCV of $1,500 for the shelving. (Exhibit C-2.)

---

8. It is not clear whether these estimates included sales tax.

9. This RCV corresponds to the quote for $99,000 by abs-Canon (exhibit P-75) plus 7 percent sales tax.

(89) Hartford's advances to TJS included $1,125 for the shelving, or $1,500 minus 25 percent depreciation. (Exhibits C-2 and P-39, P-124.)

(90) TJS claims to have replaced the shelving. Aside from the testimony of Thomas Sicalides, there is no evidence in the record that TJS replaced the shelving or entered into a contract to do so. (N.T. 394.) Counsel for TJS admitted that TJS never informed Hartford that the shelving was replaced. (N.T. 478-79, 483.)

## E. The Automatic Dispatchers

(91) Nine automatic phone dispatchers were destroyed in the incident. (Exhibits P-12, P-114 at 5 and C-1.)

(92) Mycek accepted the dispatchers as a total loss. (N.T. 313-14; exhibit P-72.)

(93) TJS and Hartford agreed that the RCV of the dispatchers is $5,047 each, not including tax. (Exhibits C-1, C-2 and P-60.) Hartford's total RCV for the dispatchers is $48,602.61, (exhibit C-1), which is the total cost of nine dispatchers plus 7 percent sales tax. (Exhibit P-60.)

(94) In a May 27, 1999 letter to Peterman, Mycek stated that Hartford would pay for one new dispatcher, and that, after Hartford inspected the new dispatcher, Hartford would pay the ACV for the remaining dispatchers. (Exhibit P-72.). Hartford's reason for not advancing the ACV for nine dispatchers was that the manufacturer of the dispatchers would not return Mycek's calls, and that Mycek suspected that the manufacturer was a friend of Thomas Sicalides. (N.T. 517-18.)

(95) Though Mycek stated in correspondence to Peterman that Mycek would seek verification of the dis-

patcher quote from other vendors, there is no evidence that Mycek did so. (Exhibit P-115.)

(96) Hartford's advances to TJS included $5,047 to replace one dispatcher. (Exhibits C-2 and P-39, P-115, P-124.)

(97) On July 8, 1999, Peterman informed Hartford by letter that, because computer installation was almost complete, TJS was ready to order the dispatchers. (Exhibit P-38.) Peterman informed Hartford that the order would require a substantial deposit. (Exhibit P-38.) There is no evidence in the record of a response to the letter.

(98) TJS has not replaced any of the dispatchers. (N.T. 394-95; exhibit P-60.) TJS did not replace the dispatcher or other property because it used available funds to pay other expenses that Hartford did not reimburse. (N.T. 395.)

## F. The Security System

(99) Included in TJS's property claim is a video security system, which apparently included cameras and a video monitor. (Exhibits C-1 and P-8.)

(100) TJS obtained a quote of $2,710 for replacing the security system. (Exhibit P-8.) It is not clear whether Hartford received a copy of this quote (N.T. 79), but Hartford received notice of the amount quoted. (Exhibit P-12.)

(101) TJS now claims an RCV of $3,862.65 for the security system. (Exhibit C-2.)

(102) Hartford disputes the extent of damage to the security system. (N.T. 427-28; exhibits P-72, P-73.)

(103) The record does not show that TJS replaced the security system.

## G. The Television

(104) The record shows that a television was damaged in the incident. (Exhibits C-1, C-2.)

(105) There are no quotes in the record for replacement of the television.

(106) TJS claims an RCV of $395.85 for the television. (Exhibit C-1.)

(107) Hartford claims an RCV of $245.03 for the television. (Exhibit C-2.)

(108) Hartford's advances to TJS included $196.02 for the television, or $245.03 minus 20 percent depreciation. (Exhibits C-2 and P-39, P-124.)

(109) The record does not show that TJS replaced the television.

## H. The ONEAC Power Conditioner

(110) Included in TJS's business personal property claim was as ONEAC power conditioner. (Exhibit P-12.)

(111) TJS alleges an RCV of $8,406.99 for the ONEAC.

(112) The record does not make clear whether the ONEAC is damaged. In a May 27, 1999 letter, Mycek stated that the ONEAC did not appear to be damaged. (Exhibit P-72.) In a June 14, 1999 letter, Sprint recommended not reusing the ONEAC. (Exhibit P-32.) In an October 19, 1999 letter, TJS asked Sprint whether TJS could use the ONEAC with the new Sprint equipment. (Exhibit P-81.) In a November 22, 1999 letter, Sprint responded that use of the ONEAC with TJS's phone equipment would void the warranties on the phone equipment. (Exhibit P-87.) Sprint recommended replacement of the ONEAC. (Exhibit P-87.)

## I. The Office Repairs

(113) Included in TJS's claim is damage to TJS's office, including damage to carpet and walls. (Exhibits C-1 and P-7, P-29.)

(114) Some of the repairs may be complete. (Exhibit P-7.)

(115) TJS submitted to Hartford bills for $1,280.41 for completed repairs and an estimate of $9,463 for additional repairs. (Exhibit P-7.) Hartford also inventoried the office damage and gave estimates for its repair. (Exhibit P-29.)

(116) Mycek raised the issue that TJS's landlord may be responsible under the lease for some of the damage, or that the damage may be covered under the landlord's insurance policy. (Exhibits P-21, P-72.) Mycek requested information to clarify this issue (exhibit P-72), but the record does not show that TJS satisfied these requests.

## J. Other Property

(117) The record shows numerous other items of property in TJS's claim, including fax machines, Sprint reader boards, music on hold, Octel voice mail and several items of computer equipment. (N.T. 86-87; exhibits C-1 and P-12, P-13, P-18, P-39.)

(118) Hartford made no advances on these items. (Exhibits C-2 and P-39, P-125.)

## VI. *The Copier Warranties*

(119) When TJS purchased the policy, TJS specifically asked Peterman to obtain coverage of the warranties of TJS's three copiers. The purchase price of the warranties was $96,107.40. (Exhibit C-1.) Peterman dis-

cussed the issue with Hartford's underwriter. Peterman and the underwriter agreed that the valuable papers coverage was the best place to cover the warranties. Based on Peterman's representations, TJS purchased an increased limit of $100,000 in valuable papers coverage to cover the warranties. (N.T. 65-67, 110-11.)

(120) There is no writing evidencing the conversations between Peterman and the underwriter. (N.T. 111.)

(121) The loss of the three copiers on April 2, 1999 made the copier warranties valueless, and TJS included a valuable papers claim for the copier warranties. (Exhibit C-1.)

(122) Hartford denied the claim on the ground that the warranties are not included in the valuable papers coverage. (N.T. 236-38; exhibits P-37, P-72.)

(123) The policy defines valuable papers as "inscribed, printed or written documents, manuscripts or records, including abstracts, books, deeds, drawings, films, maps or mortgages." (Exhibit P-108, form CM 00 67 06 95 at 3.)

(124) The policy states that the valuable papers coverage applies to "costs *to research, replace or restore the lost information* on lost or damaged: (1) valuable papers and records, including those which exist on electronic or magnetic media . . . and (2) project research and development documentation . . . for which duplicates do not exist." (Exhibit P-108, form HP 04 10 01 92 at 7 and form CP 00 10 06 95 at 7.) (emphasis added)

## VII. *TJS's Financial Condition*

(125) Before the April 2, 1999 incident, TJS's operations were dependent on computer equipment, phone switch equipment and the automatic dispatchers. (N.T. 395-96.)

(126) The destruction of the equipment left TJS unable to handle its earlier volume of business. (N.T. 395-97; Sicalides aff. ¶¶19-30.)

(127) TJS's income has decreased since the April 2, 1999 vandalism incident. (N.T. 147, 397, 414.) Thomas Sicalides testified that TJS's income before April 2, 1999 was approximately $110,000 per month. (N.T. 414.) MD&D accountant Bradley Ryden testified that TJS's income for June 1999 was $40,000 to $50,000, and its income for July 1999 was "in the low 20s." (N.T. 147.) Thomas Sicalides testified that, as of the March 2, 2000 hearing, TJS's income was $20,000 per month. (N.T. 414.)

(128) The loss of the automatic dispatchers was especially disruptive. The automatic dispatchers provide the means by which TJS locates haulers for a freight. When a customer contacts TJS with freight for shipment, TJS inputs a message into a dispatcher, and the dispatcher transmits the message to carrier companies, notifying them of the available shipment and its destination. Because one dispatcher can make 800 calls per day, the dispatcher provides an efficient means for matching a shipment with a carrier. (N.T. 396-97.)

(129) Since the April 2, 1999 incident, TJS went from 20 employees to six. (N.T. 5-6, 353, 401, 414; Sicalides aff. ¶60.)

(130) To raise cash, TJS factored some of its receivables in June or July of 1999. (N T. 401-402; exhibit P-47.)

(131) TJS is past due in paying its rent, its employee payroll, its telephone bills and its bills from other vendors. (N.T. 413.)

(132) Since the April 2, 1999 incident, TJS has been unable to pay certain carriers. As a result, claims have been made against TJS's FHA bond, which was underwritten by the Peterman Company. (N.T. 94.)

(133) TJS, the Peterman Company, Young Adjustment and TJS's counsel advised Hartford of TJS's financial status. (N.T. 250-51; exhibits P-9, P-14, P-19, P-33, P-40, P-84, P-117, P-120, P-126.)

## VIII. *Hartford's Unsupported Fraud Theory*

(134) Hartford did not deny liability under the policy or assert any fraudulent conduct by TJS related to the April 2, 1999 vandalism incident until after TJS filed this lawsuit. (N.T. 72-73, 84, 96, 203, 412-13.) Hartford first raised the fraud issue on February 23, 2000 in the preliminary injunction hearing. (N.T. 18-19.)

(135) Hartford bases its fraud theory on (a) Vincent and Thomas Sicalides' familial relationship; (b) discrepancies between the police report, the statements of on-the-scene witnesses and the testimony of Sicalides, Crisci and Eileen Thompson; (c) a single witness' testimony that TJS owed a $1,000,000 in debts; and (d) the federal government's seizure of TJS's records. (N.T. 536-42; Hartford's proposed findings of fact ¶¶15-41.)

## DISCUSSION

In determining whether to grant a preliminary injunction, a court may consider the averments of the pleadings and petition, affidavits of the parties or third parties, or any other proof. Pa.R.C.P. 1531. A preliminary injunction is "a most extraordinary form of relief which is to be granted only in the most compelling cases." *Goodies Olde Fashion Fudge Co. v. Kuiros,* 408 Pa. Super.

495, 501, 597 A.2d 141, 144 (1991). "The purpose of a preliminary injunction is to preserve the status quo as it exists *or previously existed before the acts complained of,* thereby preventing irreparable injury or gross injustice." *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 259, 602 A.2d 1277, 1286 (1992). (emphasis in original) "A preliminary injunction should issue only where there is urgent necessity to avoid injury which cannot be compensated for by damages." *Id.*

The court may grant the injunction only if the moving party has sufficiently established the following elements: (1) that relief is necessary to prevent immediate and irreparable harm that cannot be compensated by damages, (2) that greater injury will occur from refusing the injunction than by granting it, (3) that the injunction will restore the parties to the status quo as it existed immediately before the alleged wrongful conduct, (4) that the wrong is actionable and an injunction is reasonably suited to abate that wrong, and (5) that the plaintiff's right to relief is clear. *School District of Wilkinsburg v. Wilkinsburg Education Association,* 542 Pa. 335, 337-38 n.2, 667 A.2d 5, 6 n.2 (1995); *New Castle Orthopedic Associates v. Burns,* 481 Pa. 460, 464, 392 A.2d 1383, 1385 (1978).

These requisite elements "are cumulative, and if one element is lacking, relief may not be granted." *Norristown Municipal Waste Authority v. West Norriton Township Municipal Authority,* 705 A.2d 509, 512 (Pa. Commw. 1998).

## I. *TJS Has Shown a Risk of Irreparable Harm That Outweighs Any Harm to Hartford*

"An injury is regarded as 'irreparable' if it will cause damage which can be estimated only by conjecture and

not by an accurate pecuniary standard." *Sovereign Bank v. Harper,* 449 Pa. Super. 578, 593, 674 A.2d 1085, 1093 (1996). The court in *Sovereign Bank* emphasized, however, that a plaintiff can show irreparable harm even if the potential damages are readily calculable. *Id.* The court stated that "[i]n the commercial context, the impending loss of a business opportunity or [commercial] advantage may aptly be characterized as an 'irreparable injury' for this purpose." *Id.* (holding that plaintiff had established irreparable harm where defendants' action deprived plaintiff of the bona fide market advantage of an agreement of sale).

A court should not grant a preliminary injunction merely because the plaintiff alleges the loss of some business; instead, the loss must be great enough "to threaten the existence of the business . . . ." *Three County Services v. Philadelphia Inquirer,* 337 Pa. Super. 241, 249, 486 A.2d 997, 1001 (1985) (vacating order granting preliminary injunction).[10]

---

10. See *Federal Leasing Inc. v. Underwriters at Lloyd's,* 650 F.2d 495, 499-500 (4th Cir. 1981) (affirming order granting preliminary injunction that required insurer to process plaintiff's claim for insurance benefits where, absent payment, plaintiff would be rendered bankrupt); *Semmes Motors Inc. v. Ford Motor Co.,* 429 F.2d 1197 (2d Cir. 1970) (affirming preliminary injunction where defendant threatened to terminate plaintiff's dealership and thereby end plaintiff's business, and stating that award of lost profits will not compensate for loss of right to continue a business); *In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137, 1146 (3d Cir. 1982) (vacating preliminary injunction where evidence was insufficient to show that plaintiff was on verge of bankruptcy); *Graham v. Triangle Publications Inc.,* 344 F.2d 775, 776 (3d Cir. 1965) (affirming the denial of a preliminary injunction where it was clear that any loss that plaintiff suffered during proceeding was ascertainable by calculating lost profits and where there was no threat of destruction of the business enterprise); *Courier Times*

A case in which our Superior Court concluded that a preliminary injunction should be granted where the irreparable harm consisted of a "potential loss of . . . funds which are needed to carry on its business" is *East Hills TV & Sporting v. Dibert,* 366 Pa. Super. 455, 460, 531 A.2d 507, 509 (1987). The plaintiff in *East Hills TV* made an oral agreement with the defendant for the purchase of a number of VCRs. *Id.* The plaintiff paid the defendant the agreed price for the VCRs. Shortly after payment, on the basis of information indicating that the defendant might be unwilling or unable to acquire the VCRs, the plaintiff filed a complaint in equity to rescind the contract. The plaintiff also requested a preliminary injunction prohibiting the defendant from spending the $39,000 that the plaintiff paid him and that was on deposit in the defendant's bank account. The trial court granted a preliminary injunction and directed the bank to pay the funds at issue to the plaintiff. The Superior Court affirmed the order, and stated:

"The purpose of a preliminary injunction is to preserve the status quo as it existed before the acts complained of, and thereby prevent irreparable injury or gross injustice. *Slott v. Plastic Fabricators Inc.,* 402 Pa. 433, 167 A.2d 306 (1961). The act complained of in the instant action is [defendant's] allegedly fraudulent representation that he could obtain video cassette recorders through a bankruptcy sale in the State of Connecticut.

---

*Inc. v. United Feature Syndicate Inc.,* 300 Pa. Super. 40, 53-54 n.8, 56-58, 445 A.2d 1288, 1294-95 n.8, 1296-97 (1982) (affirming issuance of preliminary injunction forcing defendant to honor syndication agreement, even though plaintiffs did not allege that they would otherwise cease to exist).

The 'status quo' in the instant action would place [plaintiff's] $38,940 in funds back in its own hands, where it was at the time of appellant's representation. *The irreparable injury is the potential loss of [plaintiff's] funds which are needed to carry on its business." East Hills TV,* 366 Pa. Super. at 460, 515 A.2d at 509. (emphasis added)

The court in *East Hills TV* also held that the testimony of the plaintiff's owner that much of his line of credit was tied up in the aborted transaction provided the necessary "reasonable grounds" upon which the trial court's decision to return the money was based. *Id.* "It is evident that without that money, the business could not continue." *Id.;* compare with *Three County Services v. Philadelphia Inquirer,* 337 Pa. Super. 241, 249, 486 A.2d 997, 1001-1002 (1985) (denying request for preliminary injunction because plaintiff had not produced sufficient evidence that "the threatened monetary loss is so great as to threaten the existence of the business . . .").

In a case involving breach of an insurance policy, the United States Court of Appeals for the Fourth Circuit affirmed a preliminary injunction that required an insurer to process a policyholder's claims in good faith. *Federal Leasing Inc. v. Underwriters at Lloyd's,* 650 F.2d 495, 500-501 (4th Cir. 1981). The plaintiff in *Federal Leasing* was in the business of leasing computers in the 1970s. The plaintiff bought the computers on credit, with the lender retaining a security interest in the computers. The plaintiff then leased the equipment to its customers. The plaintiff assigned all or part of the lease payments to the lender in order to amortize the loans. The leases were terminable on notice by the customers. Because innova-

tions in the computer industry came slowly in those days, the plaintiff and its lenders were able to remarket any returned computers and thereby avoid any losses due to lease terminations. Therefore, early terminations did not create a significant risk. Foreseeing revolutionary innovations in the computer market, the plaintiff asked defendant to insure against any losses occasioned from the inability to remarket returned computers. From 1973 to 1978, the plaintiff made only seven claims against this policy, and the defendant paid them.

In 1977, a revolutionarily innovative computer came on the market and rendered the plaintiff's existing computers obsolete. Many customers canceled their leases in order to buy the new computers. The plaintiff was stuck with many millions of dollars worth of returned computers that were obsolete and unmarketable. The plaintiff made claims for these losses, but defendant refused to pay. Several lenders sued the plaintiff, and one lender obtained a judgment against the plaintiff. The record established that if all the claims against the plaintiff were reduced to judgment, the plaintiff would have been rendered bankrupt. The court held that this threat to the survival of the plaintiff constituted irreparable harm: "[Plaintiff] does not seek, and has not received, the mere acceleration of a money debt otherwise compensable in damages. It seeks to preserve its existence and its business." *Federal Leasing,* 650 F.2d at 500. The court even indicated that something less than a threat to its existence would have satisfied the irreparable harm test: "Even if Federal were to survive, the continuation of its present predicament endangers its relations with customers and investors, the good will built up by a here-

tofore successful enterprise . . . ." *Id.* Finding that the plaintiff was threatened with irreparable harm, the court affirmed the trial court's order granting a preliminary injunction. *Id.* at 500-501.

In its brief, Hartford cites *Vanderveen v. Erie Indemnity Co.,* 417 Pa. 607, 208 A.2d 837 (1965), to support its argument that a court may not enjoin an insurer's breach of an insurance agreement. In *Vanderveen,* the plaintiff was involved in a car accident and was subject to a claim for damages. Alleging that he was protected by an insurance policy issued by the defendant, the plaintiff brought an action in equity, seeking specific performance of the defendant's duty to defend the car accident claim. The trial court entered a decree ordering the defendant to defend the claim. *Id.*

The trial court found that threat of imminent, irreparable harm existed. *Id.* Because the plaintiff's "insurance coverage was questioned, plaintiff's ability to establish financial responsibility, as required by the Pennsylvania Motor Vehicle Responsibility Act, was seriously affected, which could result in suspension of his automobile operating privileges . . . ." *Id.* at 608-609. (footnote omitted) The trial court held that the threat of losing one's license constituted irreparable harm. *Id.* at 609.

Our Supreme Court reversed. *Vanderveen, supra.* The court specifically found a lack of irreparable harm inter alia, because (1) the financial responsibility law provided for an appeal of a determination of any suspension, the filing of which acted as a supersedeas of the suspension; (2) the plaintiff's expenses in resisting any suspension were recoverable in a legal action; and (3) the Secretary

of Revenue had agreed to withhold any suspension action until the question of insurance coverage was legally determined. *Id.* The court held that these provisions obviated any hardship to the plaintiff. *Id.*

*Vanderveen* is an illustration of the rule that in contract actions, including actions involving insurance contracts, the plaintiff generally has an adequate remedy at law. The court in *Vanderveen* did not hold that equitable relief is never available in insurance coverage actions. That the court felt it necessary to analyze plaintiff's irreparable harm claim at all shows that irreparable harm might be shown in an insurance coverage action. See *Hill v. Nationwide Insurance Co.,* 391 Pa. Super. 184, 570 A.2d 574 (1990) (affirming issuance of permanent injunction requiring the defendant insurer to pay plaintiff's future medical bills); *Federal Leasing,* 650 F.2d at 500. *Vanderveen* is also distinguishable in that the plaintiff in *Vanderveen* was not threatened with the loss of a business.

The record shows that TJS is threatened with immediate and irreparable harm. In its petition, TJS seeks more than just the acceleration of the debt that Hartford owes. TJS seeks to prevent the loss of its business. Before the April 2, 1999 vandalism incident, TJS depended on its office equipment to conduct its operations. Vincent Sicalides destroyed much of that equipment. Hartford has refused to adjust fully TJS's claims, such that TJS has been unable to replace the damaged equipment.

The uncontradicted testimony of Thomas Sicalides shows that the destruction of the equipment caused a significant disruption in TJS's business. The lack of funds caused TJS to be unable to replace most of the equip-

ment.[11] TJS was forced to lay off employees and to sell accounts receivable to a factoring agent. TJS is unable to pay its debts, and claims have been made against its FHA bond. TJS could have avoided much of the disruption had Hartford timely adjusted TJS's claims. Avoiding such a disruption was the very purpose behind TJS's purchase of the policy.

The court must balance the risk of harm to TJS against the risk of harm to Hartford. Should the court grant the injunction, the risk to Hartford is purely monetary. Hartford might lose the money it pays to TJS if Hartford prevails in this suit and if TJS is unable to repay Hartford. The probability of harm to Hartford depends in part on whether TJS prevails on the merits of its suit: if the court ultimately determines that Hartford is obligated to pay, there can be no harm in requiring that payment now. Hartford has only one defense—fraud—to the bulk of TJS's property and valuable papers claims. Because the fraud defense finds scant support in the record, the risk of this harm is small.

On the other hand, if TJS does not receive the insurance payments it claims, its ability to remain in business is threatened. The demise of TJS's business would be an incalculable harm not only to TJS, but to its remaining employees.

---

11. Hartford argues that TJS made a choice in not replacing damaged equipment. This argument ignores the fact that, as with the phone switch and the computers, TJS would likely need the ACV of a piece of equipment before making a down payment. It also ignores the history of the adjustment of the phone switch claim; in replacing another piece of equipment, TJS risks not receiving the depreciation holdback from Hartford.

The court concludes that TJS has demonstrated a risk of imminent and irreparable harm that outweighs any harm to Hartford.

## II. *A Preliminary Injunction Would Preserve the Status Quo That Existed Before Hartford Stopped Adjusting TJS's Claims*

The status quo that a preliminary injunction preserves is the last actual, peaceable and lawful noncontested status which preceded the pending controversy. *Shanaman v. Yellow Cab Co. of Philadelphia,* 491 Pa. 516, 519, 421 A.2d 664, 666 (1990); *Lewis v. City of Harrisburg,* 158 Pa. Commw. 318, 327, 631 A.2d 807, 812 (1993).

The controversy at issue is Hartford's allegedly unlawful nonpayment of the remainder of TJS Brokerage's claims. The record indicates that Hartford made payments on TJS's claims from April 19, 1999 until June 18, 1999. (Exhibit P-125.) Sometime after June 18, 1999, Hartford's adjustment of these claims stopped. (N.T. 94-95.) The last actual, peaceable and lawful noncontested status was on or about June 18, 1999, when Hartford was still processing and paying TJS's claims. A preliminary injunction requiring Hartford to process the remainder of TJS's claims in good faith would restore the parties to that status.

## III. *The Wrong to TJS Is Actionable, and an Injunction Is Reasonably Suited To Abate That Wrong*

TJS has demonstrated that the alleged wrong is actionable and that an injunction would be reasonably suited to abate the wrong. An insurer's breech of an insurance

contract is actionable. See *e.g., Tonkovic v. State Farm Mutual Automobile Insurance Co.,* 513 Pa. 445, 521 A.2d 920 (1987). TJS purchased insurance coverage that would allow TJS to weather catastrophic events that might otherwise put TJS out of business. Such an event has occurred, and Hartford refuses to honor that coverage. Hartford's refusal to process TJS's claim threatens the destruction of TJS by events against which it had insured itself. An injunction requiring Hartford to honor the contract and process TJS's claims would be reasonably suited to abate the harm from those events.

### IV. *TJS Has Demonstrated a Clear Right to Relief on Its Property and Valuable Papers Claims But Not on Its Business Income Claim*

### A. The Record Does Not Support Hartford's Fraud Defense

The court finds little support in the record for Hartford's fraud defense. To succeed in its fraud defense, Hartford must prove by clear and convincing evidence (1) that TJS made a false statement, (2) that TJS made the false statement knowingly or in bad faith, and (3) that the subject matter of the statement was material to the insurance transaction. *Tudor Insurance Co. v. Township of Stowe,* 697 A.2d 1010, 1017 (Pa. Super. 1997).[12]

---

12. *Tudor* involved an insured's misrepresentations in an insurance application. *Tudor,* 697 A.2d at 1010. Though no published Pennsylvania appellate decision sets forth the standard for misrepresentation during the insurer's investigation of a claim, the court sees no reason not to extend the three-prong standard to a misrepresentation during the investigation. See *Saracco v. Vigilant Insurance Co.,* 2000 U.S. Dist. Lexis 1685 at *7-8 & n.7 (E.D. Pa.) (stating that, though the

There is nothing in the record to show that any statement by TJS was false, that TJS lied to Hartford about TJS's financial status before the incident, or that TJS submitted bad faith claims for undamaged or nonexistent items. Hartford only argues that a jury could find that TJS's version of how the vandalism occurred is impossible. The court does not agree.

## B. TJS Has Not Demonstrated a Clear Right to Relief on the Business Income Loss Claim

On the record, it appears that Hartford and MD&D made numerous demands for information needed to adjust the business income loss claim. Based on preliminary estimates of TJS's business income loss, Hartford advanced $50,000 for April 1999 and $50,000 for May 1999. After this second advance, Hartford refused to make further advances until TJS complied with its requests for financial information. (Exhibit D-7.) It is not clear that these requests were unreasonable or that TJS complied with these requests.

TJS asks for a mandatory injunction compelling Hartford to perform under a contract. A court may grant a mandatory injunction only upon a very strong showing that a plaintiff has a clear right to relief. *Sovereign Bank,* 449 Pa. Super. at 592, 674 A.2d at 1092. TJS has not met this burden as to its business income loss claim. Though TJS is not precluded from proving at trial that Hartford breached its contractual duties or exercised bad faith in

three-prong test originally applied in cases involving misrepresentations in applications, courts in the Third Circuit have applied the test to concealment or misrepresentation during an insurance company's investigation of a claim).

regard to the business income claim, the court cannot now determine that TJS has a clear right to relief on that claim.

## C. TJS Has Demonstrated a Clear Right to Relief on Its Business Personal Property Claim

The court is not convinced, however, that Hartford has adjusted the property loss claims in good faith. The record clearly shows that Hartford has shortchanged TJS on some of its reimbursements. Hartford clearly agreed to pay TJS the ACV of a covered loss regardless of whether repair or replacement actually occurred. Hartford admits that there is no co-insurance issue as to the business personal property and computer coverage. (N.T. 247.)

Hartford's only defense to liability for the ACV of TJS's covered property is insurance fraud. Because there is no evidence in the record of fraud, the court finds that TJS has demonstrated a clear right to relief on its claim for the ACV of certain items of business personal property.

The policy does not define ACV. Courts have consistently defined ACV as "the actual cost of repair or replacement less depreciation." *Gilderman v. State Farm Insurance Co.,* 437 Pa. Super. 217, 221, 649 A.2d 941, 943 (1994), quoting *Canulli v. Allstate Insurance Co.,* 315 Pa. Super. 460, 462 A.2d 286 (1983). "Repair or replacement costs . . . include any costs that an insured [is reasonably likely] to incur in repairing or replacing [a] covered loss." *Gilderman,* 437 Pa. Super. at 225, 649 A.2d at 945.

The parties agree that, absent fraud, the following items are covered: the phone switch, the computer system, the three copiers, the shelving and the television. Hartford

has paid the ACV of the computer system, the phone switch, the shelving and the TV.[13] (Exhibit C-2.) There is insufficient evidence in the record at this time for the court to consider valuation disputes on these four items. Though TJS is not foreclosed from contesting Hartford's valuations of these items at trial, the court cannot now determine that TJS has a clear right to a higher ACV than Hartford paid on the computer system, the phone switch, the shelving and the TV.[14]

For the copiers, however, Hartford has paid less than it has admitted is due to TJS. Hartford paid TJS an ACV of $62,699 based on an RCV of $78,374 depreciated at 20 percent. (Exhibit C-2.) The record clearly shows that, after paying the $64,699, Mycek agreed to a higher RCV of $88,907 for the copiers.[15] (Exhibit P-46.) By Mycek's

---

13. The court is aware of no authority stating whether RCV and ACV include sales tax. Hartford included 7 percent sales tax in its RCV of the computer system. Hartford calculated the ACV of the phone switch from an RCV that included 6 percent sales tax. From Hartford's practice of paying sales tax as part of some of TJS's claims and the broad definition of replacement cost in *Gilderman,* the court holds that RCV includes sales tax and ACV includes depreciated sales tax. *Gilderman,* 437 Pa. Super. at 225, 649 A.2d at 945. Therefore, Hartford's adjustment of the property claim should include any unpaid sales tax or depreciated sales tax on the phone switch, copiers, shelving and TV.

14. TJS did not dispute Hartford's method for depreciating the various items of property. Thomas Sicalides said that Mycek told him that TJS "would get somewhere around 75 to 85 percent of the replacement cost" of the property should TJS elect not to replace the property. (N.T. 390.) These figures are in line with the 20 percent and 25 percent depreciation that Hartford actually applied. (Exhibit C-2.)

15. Even this higher figure is $10,000 lower than the lowest of the four estimates provided by TJS. (Exhibits P-7, P-58, P-75.)

own reckoning, Hartford owes TJS at least an additional $9,264 for the copiers.[16]

TJS obtained an estimate of $48,602.61 for the replacement of the automatic dispatchers, and Hartford does not dispute that estimate. (Exhibit P-60.) TJS gave Hartford the identity of the manufacturer and Hartford had ample opportunity to correspond with the manufacturer. (Exhibits P-17, P-24, P-26, P-29.) Hartford has possession of the dispatchers and has inspected them. (Exhibits P-72, P-97.) In spite of clear terms in the policy requiring that Hartford pay the *ACV* of *nine* dispatchers, Hartford continues to argue that it owes only the *replacement cost* of *one* dispatcher. The court concludes that Hartford has offered no credible defense to paying TJS the ACV of all nine dispatchers based on an RCV of $48,602.61. Therefore, TJS has a clear right to relief for the dispatchers for $48,602.61 minus reasonable depreciation and minus the $5,047 already paid.

While it is true that the amount due for these dispatchers is calculable, Hartford's failure to tender timely payment so that TJS could replace the dispatchers had the practical effect of inflicting potentially irreparable harm on TJS's business. The record demonstrates that the dispatchers played a vital role in TJS's business as a transportation broker. These dispatchers enabled TJS to locate haulers for freight. A single dispatcher can make as many as 800 calls per day. Findings of fact ¶128. Eight dispatchers were destroyed during the April 2, 1999 incident and Mycek accepted them as total loss. Findings of fact ¶¶91-92. The net effect of Hartford's refusal to

---

16. ($88,907-$78,374) x 80 percent.

reimburse TJS for eight of the nine dispatchers is incalculable and creates irreparable harm.

As for the remaining property claims, the court cannot determine on the record which items are covered and, if so, what their values are. The court does note that TJS has provided Hartford with replacement cost estimates and receipts for some of these items. (Exhibits P-8, P-12, P-13.) TJS has made the property available to Hartford for inspection. Though Hartford is clearly in the position to do so, on the record it appears that Hartford neither paid these claims nor offered a good faith reason for denying the claims. The court will order Hartford to process these claims accordingly. TJS also has a clear right to relief to the depreciation holdback on the Sprint phone switch. To receive replacement cost benefits, TJS must (1) repair or replace the property or enter into a binding contract to repair or replace the property, and (2) request replacement cost benefits. *Gatti v. State Farm Fire and Casualty Co.,* no. 2469 Philadelphia 1998, slip op. J. A28006/99 at 4, 6 and 7 (Pa. Super. 1999.)

Hartford paid the depreciation holdback for the computer system. It denies liability for the depreciation holdback for the phone switch and the shelving. Hartford asserts two defenses to paying the depreciation holdback on the phone switch. The first defense—that TJS is not entitled to the depreciation holdback because TJS has not submitted a properly executed proof of loss—has no merit. It is clear that Hartford did not see the proof of loss issue as barring recovery for the depreciation holdback. First, Hartford paid the depreciation holdback for the computers even though it had not yet received a proof of loss. Second, the policy requires submission of a proof of loss only on demand. (Exhibit P-108.) Hartford never

demanded a proof of loss for the property claim. (Exhibit D-7.)

The second defense—that TJS is not entitled to the depreciation holdback because TJS did not submit the final invoice for the phone switch—is also meritless. The law does not require that replacement be complete before an insured is entitled to replacement. *Gatti,* no. 2469 Philadelphia 1998, slip op. J. A28006/99 at 4, 6 and 7. A binding contract to replace the property and notice to Hartford of that contract are sufficient to trigger Hartford's duty to pay the depreciation holdback. *Id.* Mycek knew in April 1999 that TJS had entered into a contract with Sprint to replace the phone switch. TJS sent Mycek a copy of the contract, and Mycek approved it. At that time, TJS was entitled to the depreciation holdback for the computers.

Furthermore, the record shows that Hartford has not made it clear that it required an invoice before paying the depreciation value. On the contrary, Mycek led TJS and Peterman to believe that a purchase order would suffice. Mycek wrote in two separate pieces of correspondence that Hartford would pay the depreciation holdback upon receipt of a purchase order. (Exhibits P-24, P-72.) In a third piece of correspondence, Mycek stated in one paragraph that an invoice was required, and in another paragraph that a purchase order was required. (Exhibit D-1.) Peterman later wrote to Mycek that "based upon our prior understanding if given a signed purchase order you will be able to pay the full replacement cost." (Exhibit P-38.) Finally, Hartford's conduct with regard to the computers shows that a final invoice was not a requirement for payment of the depreciation holdback. On June 3, 1999, before the vendor delivered the computers

and while final payment was pending, Peterman's office faxed the purchase order for the computers to Mycek with a request that Hartford pay TJS the depreciation holdback for the computers. (Exhibit P-74.) On June 18, 1999, Hartford paid TJS $33,436.15 for that holdback. (Exhibit P-124.) There is no evidence in the record that Mycek requested an invoice proof of payment or proof of delivery before paying the depreciation holdback. The record shows that, on the contrary, Mycek issued the payment without knowing whether the computers had been delivered; on August 16, 1999, Mycek wrote to Thomas Sicalides to ask whether the vendor had delivered the computers. (Exhibit P-51.) The record shows that TJS's right to payment for the depreciation holdback for the phone switch is clear.

Though uncontradicted testimony indicates that the shelving was replaced, TJS has not produced any evidence of the cost to replace the shelving or evidence that it has notified Hartford of the replacement. It appears on the record that TJS is entitled to replacement cost for the shelving only upon giving Hartford (1) notice that the shelving was replaced or that a contract to replace the shelving has been entered into, and (2) evidence of the cost of the shelving.

## D. TJS Has Demonstrated a Clear Right to Relief on Its Copier Warranties Claim

TJS makes two arguments for coverage of the copier warranties. First, TJS argues that the policy definition of valuable papers is ambiguous. A court decides, as a matter of law, whether a contract provision is ambiguous. *Herr v. Grier,* 448 Pa. Super. 216, 220, 671 A.2d 224, 226 (1995). A term is ambiguous if it is reasonably sus-

ceptible to different constructions and capable of being understood in more than one way. *Metzger v. Clifford Realty Corp.*, 327 Pa. Super. 377, 386, 476 A.2d 1, 5 (1984). If the court were to conclude that the valuable papers coverage provision is ambiguous, parol evidence of preliminary negotiations or oral agreements—for example, Peterman's testimony—would be admissible to clarify the ambiguity. *Sunbeam Corp. v. Liberty Mutual Insurance Co.*, 740 A.2d 1179, 1185 (Pa. Super. 1999) (stating that the parol evidence rule apples to insurance contracts; *Genie Trucking Line v. American Home Assurance Co.*, 362 Pa. Super. 456, 462-63, 524 A.2d 966, 969 (1987).

The court concludes that the valuable papers coverage provision is unambiguous. Though the provision does not specifically exclude coverage of the value of the warranties (N.T. 239-40), it is capable of only one meaning: Hartford will pay the costs to restore the information contained on valuable papers and records. Because the valuable papers provision is not ambiguous, parol evidence of any oral agreement to provide coverage for the warranties is inadmissible. *Sunbeam Corp.*, 740 A.2d at 1185.

Second, the plaintiff argues that, in spite of the clear language of the written contract, the valuable papers coverage includes the warranties because of Peterman's representations. The record shows that TJS sought coverage for the copier warranties, that a Hartford underwriter told Peterman that the valuable papers coverage included coverage of the warranties, that Peterman relayed this information to TJS, and that TJS purchased increased limits for coverage of the warranties by paying an additional premium. Without explicitly saying so in its pa-

pers, TJS effectively argues that the warranties are covered because Hartford created in TJS a reasonable expectation of coverage. See *Tonkovic v. State Farm Mutual Automobile Insurance Co.,* 513 Pa. 445, 521 A.2d 920 (1987). The court agrees.

The proper focus regarding issues of coverage under insurance contracts is the reasonable expectations of the insured. *Tonkovic,* 513 Pa. at 456, 521 A.2d at 926; *Collister v. Nationwide Life Insurance Co.,* 479 Pa. 579, 594, 388 A.2d 1346, 1353 (1978). Though the language of the insurance policy is usually the best indicator of the insured's reasonable expectations, the court must examine the totality of the insurance transaction to ascertain those reasonable expectations. *Tonkovic,* 513 Pa. at 456, 521 A.2d at 926; *Collister,* 479 Pa. at 594-95, 388 A.2d at 1354. If the insurer, through its agent,[17] created in the insured a reasonable expectation of coverage, an unambiguous provision excluding that coverage does not bind the insured. *Rempel v. Nationwide Life Insurance Co.,* 471 Pa. 404, 416, 370 A.2d 366, 372 (1977) (holding that when, as a result of insurance agent's misrepresentations of the extent of coverage, insured mistakenly believed he had obtained more insurance coverage than insurer actually provided, parol evidence was admissible to establish that the written contract omitted the contested coverage provisions).

---

17. The court need not now decide whether Peterman acted as an agent of Hartford or as an agent of TJS when TJS purchased the policy, or whether that determination is relevant to the reasonable expectations doctrine. If Peterman acted as Hartford's agent, then Hartford created the reasonable expectation through its underwriter and Peterman. If Peterman acted as TJS's agent, Hartford created the reasonable expectation through its underwriter.

In *Tonkovic,* the plaintiff purchased a disability insurance policy from the defendant insurer. *Tonkovic,* 513 Pa. at 447, 521 A.2d at 921. The testimony of the defendant's agent showed that the plaintiff specifically applied for disability insurance that would enable him to make mortgage payments in the event of injury, regardless of where the injury should occur or whether the plaintiff should be eligible for workers' compensation benefits. The policy that the defendant issued, however, excluded coverage for workplace injuries for which workers' compensation benefits were available. There was conflicting testimony as to whether the plaintiff had received a copy of the written policy. Several months after the defendant issued the policy, the plaintiff was injured on the job and received workers' compensation benefits. The plaintiff filed a claim under his insurance policy. The defendant denied coverage based on the workers' compensation exclusion.

Our Supreme Court held that when "an individual applies and prepays for specific insurance coverage, the insurer may not unilaterally change the coverage provided without an affirmative showing that the insured was notified of, and understood, the change, regardless of whether the insured read the policy." *Tonkovic,* 513 Pa. at 455, 521 A.2d at 925. The court distinguished its earlier decision in *Standard Venetian Blind Co. v. American Empire Insurance Co.,* 503 Pa. 300, 469 A.2d 563 (1983). The insured in *Standard Venetian Blind* was a contractor who sought coverage under a general commercial liability insurance policy for damage caused to its own property. He did not specifically request coverage of his own property when he purchased his policy.

The policy contained a provision clearly excluding coverage of such losses. The court in *Standard Venetian Blind* held that, even though the insured had not read the exclusion, the exclusion was binding on the insured. *Id.* at 307-309, 469 A.2d at 567-68. In *Tonkovic,* the court found "a crucial distinction between cases where one applies for a specific type of coverage and the insurer unilaterally limits that coverage, resulting in a policy quite different from what the insured requested, and cases *[e.g., Standard Venetian Blind]* where the insured received precisely the coverage that he requested but failed to read the policy to discover clauses that are the usual incident of the coverage applied for. When the insurer elects to issue a policy differing from what the insured requested and paid for, there is clearly a duty to advise the insured of the changes so made. The burden is not on the insured to read the policy to discover such changes, or not to read it at his peril." *Tonkovic,* 513 Pa. at 454, 521 A.2d at 925.

A showing that the insured merely received a copy of the written policy does not satisfy the affirmative showing requirement. *Id.* (stating that there is no burden on the insured to read the policy to discover such changes); *Rempel,* 471 Pa. at 410-11, 370 A.2d at 369 (holding that the insured has no duty to read the policy).

This case falls clearly under *Tonkovic,* rather than under *Standard Venetian Blind.* TJS did not request general coverage of valuable papers and merely assume that the coverage would include the copier warranties; rather, the record shows that TJS specifically applied and paid extra premiums for coverage of the copier warranties. (N.T. 65-67, 236-40; exhibit P-25.) Compare with

*Schneider v. Lindenmuth-Cline Agency Inc.*, 423 Pa. Super. 73, 78, 620 A.2d 505, 509 (1993) (holding that the *Tonkovic* reasonable expectation doctrine did not apply where "[n]one of the testimony adduced at trial showed that the [insureds] requested or paid for insurance coverage other than [what] they received."). Based upon the underwriter's and Peterman's representations and the additional premium that TJS paid, it was reasonable for TJS to expect that the valuable papers provision covered the warranties. Therefore, Hartford must make an affirmative showing that TJS was informed of and understood that the copier warranties would not be covered.[18] *Tonkovic*, 513 Pa. at 455, 521 A.2d at 925. There

18. All published Pennsylvania appellate level cases applying the reasonable expectation doctrine have involved individual insureds. Other courts have applied the reasonable expectations doctrine to nonindividual insureds. See *Reliance Insurance Co. v. Moessner*, 121 F.3d 895, 906 (3d Cir. 1997) (holding that reasonable expectation doctrine applies to insured corporation under Pennsylvania law), *on remand sub nom, Reliance Insurance Co. v. VE Corp.*, 2000 U.S. Dist. Lexis 1819 (E.D. Pa.); *Bensalem Township v. International Surplus Lines Insurance Co.*, 38 F.3d 1303 (3d Cir. 1994) (applying reasonable expectations doctrine to insured township under Pennsylvania law); *C&J Fertilizer Inc. v. Allied Mutual Insurance Co.*, 227 N.W.2d 169, 176-77 (Iowa 1975) (nullifying otherwise applicable exclusions in an insurance policy based on the reasonable expectations of a commercial insured); *Canadian Universal Insurance Co. v. Fire Watch Inc.*, 258 N.W.2d 570 (Minn. 1977) (same).

In *Reliance Insurance Co. v. Moessner*, the appellate court considered an argument that the reasonable expectations doctrine does not apply to "sophisticated insureds." *Reliance Insurance Co.*, 121 F.3d at 904-908. The court characterized a sophisticated insured as a "large commercial enterprise that has substantial economic strength, desirability as a customer, and an understanding of insurance matters, or readily available assistance in understanding and procuring insurance" such as the assistance of legal counsel or insurance brokers. *Id.* at 904 n.8. The court predicted that Pennsylvania courts would "apply the

is no evidence in the record that Hartford notified TJS of the noncoverage of the warranties. In fact, Peterman's continuing belief that the policy covers the warranties indicates that Hartford did not notify Peterman or TJS of the change. (N.T. 236; exhibits P-25, P-37.) Therefore, Hartford has not made the required showing.

The court concludes that, on the current record, TJS has shown a clear right to relief on the valuable papers claim.

---

reasonable expectations doctrine, regardless of whether the insured is sophisticated, if the insurer unilaterally inserts the contested provision in the insurance policy despite the insured's request for coverage . . . ." *Id.* at 906. The court also predicted that the insurer's duty to inform would be satisfied "when a sophisticated insured is given *constructive* notice of a change *at a time when it can negotiate an alteration of the policy.*" *Reliance Insurance Co.,* 121 F.3d at 908. (emphasis added) On remand, the trial court held that the insured had not satisfied its duty to inform. *Reliance Insurance Co. v. VE Corp.,* 2000 U.S. Dist. Lexis 1819 (E.D. Pa.). The insurer did not deliver the policy to the insured until several months after the policy was paid for and issued. *Id.* at *33. At that time, the insured had no ability to negotiate a change for the desired coverage. *Id.* Therefore, the court found that the insured had not received constructive notice of the change at a time when it could negotiate an alteration of the policy. *Id.* at *33-*34. Although the insured was a "sophisticated insured," the court held that the insured's reasonable expectations controlled the coverage issue. *Id.* at *34.

This court does not decide whether TJS is a "sophisticated insured," or whether the Third Circuit's "sophisticated insured" rule is part of Pennsylvania's reasonable expectations doctrine. Even were the Third Circuit's "sophisticated insured" rule applicable and even were TJS a sophisticated insured, Hartford has made no showing that TJS could have renegotiated coverage after having already purchased the policy. Hartford has not even attempted to establish when TJS received a copy of the written policy.

## V. *The Court Will Order Hartford To Process the Computer and Valuable Papers Claims*

The preliminary injunction will not directly order Hartford to pay any of the claims involved in this litigation. The injunction will require Hartford to process the claims expeditiously and in good faith. In processing the claims in good faith, the court anticipates that Hartford will pay some claims without delay: for example, the depreciation holdback and any unreimbursed sales tax on the Sprint phone switch, the actual cash value of the automatic dispatchers less the $5,047 already paid, the remaining amount owed on the ACV of the copiers, the claim for the copier warranties[19] and any unpaid amounts based on sales tax. The court will measure the expeditiousness of the processing against that of the processing of TJS's claims from April 4, 1999 to June 18, 1999, when Hartford appeared to be paying TJS's claims in good faith.

The good faith processing of other claims may disclose that they should not be paid. For example, Hartford noted that it requested insurance information from TJS's landlord in order to evaluate whether Hartford should cover the office repair claims. As soon as Hartford receives the requested information, it should evaluate the claims in good faith, determine whether coverage exists, and pay any required amounts. Likewise, Hartford should deny or pay the claimed amounts on re-

---

19. Adjustment of the copier warranties claim may include reasonable amortization of the values of those warranties based on the expected lifespan of the copiers to which the warranties applied.

maining items of claimed property: for example, the ONEAC, the Octel voice mail, the security system, the fax machines and the music on hold.

If sound reasons exist for not paying a claim, Hartford need not pay it. Hartford should provide explicit reasons for the nonpayment of any claim. As Hartford has produced scant evidence of fraud by TJS, fraud does not constitute a sound reason. Of course, the court's finding that the record does not show fraud does not preclude Hartford from urging fraud as a defense at trial.

## CONCLUSIONS OF LAW

(1) TJS has shown that it will suffer imminent, irreparable harm if Hartford does not process TJS's business personal property and copier warranty claims.

(2) TJS has shown that greater injury will occur from denying the preliminary injunction than from granting it.

(3) TJS has shown that an injunction will restore the status quo that existed before Hartford stopped paying TJS's claims.

(4) TJS has shown that the wrong is actionable and that an injunction is reasonable to abate that wrong.

(5) TJS has shown that its right to relief is clear on the business personal property and copier warranty claims.

(6) TJS has not shown that its right to relief is clear on the business income loss claim.

(7) These conclusions require that the court grant TJS's petition for preliminary injunction as to the business personal property and copier warranty claims, and deny TJS's petition for preliminary injunction as to the business income loss claim.

On the basis of the record, the court will enter a contemporaneous order granting in part and denying in part the petition for preliminary injunction.

## ORDER

And now, April 24, 2000, upon consideration of the petition of plaintiff TJS Brokerage & Co. for a preliminary injunction, the response thereto by defendant Hartford Casualty Insurance Co., the hearing and oral argument held thereon, and all relevant documentation, it is hereby ordered that

(1) TJS's petition for a preliminary injunction as to the business income loss claim is denied, and

(2) TJS's petition for a preliminary injunction as to the business personal property and valuable papers claims is granted, on the condition that TJS file a bond in the amount of $25,000 in accordance with Pa.R.C.P. 1531(b)(1) within 10 days of the date of this order. The court will consider additional bonds at Hartford's request.

It is further ordered that Hartford process the business personal property and valuable papers claims expeditiously and in good faith in accordance with the contemporaneously filed findings of fact, discussion and conclusions of law in support of this order.

---

## ORDER

And now, April 24, 2000, upon consideration of the preliminary objections of defendant Hartford Casualty Insurance Co. to the complaint of plaintiff TJS Brokerage & Co., TJS's response thereto, and oral argument

thereon, it is hereby ordered that the preliminary objections are overruled.

It is further ordered that Hartford file an answer to TJS's complaint within 20 days of the date of this order.